## UNITED STEELWORKERS OF AMERICA, AFL–CIO, ET AL. v. NATIONAL LABOR RELATIONS BOARD ET AL.

No. 89.   Argued February 19, 1964.—Decided March 23, 1964.

*Jerry D. Anker* argued the cause for petitioners.   With him on the brief were *David E. Feller, Elliot Bredhoff* and *Michael H. Gottesman.*

*Dominick L. Manoli* argued the cause for the National Labor Relations Board.   With him on the brief were *Solicitor General Cox, Arnold Ordman* and *Norton J. Come.*

*Theophil C. Kammholz* argued the cause for respondent Carrier Corporation. With him on the brief was *Kenneth C. McGuiness.*

*Gregory S. Prince* filed a brief for the Association of American Railroads, as *amicus curiae,* urging affirmance.

Mr. Justice White delivered the opinion of the Court.

The question presented by this case is whether a union violates § 8 (b) (4) of the National Labor Relations Act,[1] 49 Stat. 449, as amended, by picketing an entrance, used exclusively by railroad personnel, to a railroad spur track located on a right-of-way owned by the railroad and adjacent to the struck employer's premises.

On March 2, 1960, after the petitioning union and the respondent company, Carrier Corporation, failed to agree

---

[1] Section 8 (b) (4) provides in pertinent part as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U. S. C. (Supp. IV) § 158 (b) (4).

494

upon a collective bargaining contract the union, which was the certified bargaining agent, called a strike in support of its demands. During the course of the strike the union picketed the several entrances to the plant. Along the south boundary of Carrier's property was a 35-foot railroad right-of-way used by the railroad for deliveries to Carrier and to three other companies in the area, General Electric, Western Electric, and Brace-Mueller-Huntley. The railroad spur ran across Thompson Road, a public thoroughfare which bounded Carrier's property on the west, and through a gate in a continuous chain-link fence which enclosed both the property of Carrier Corporation and the railroad right-of-way. The gate was locked when the spur was not in use and was accessible only to railroad employees. The picketing with which we are concerned occurred at this gate.

Between March 2 and March 10, railroad personnel made several trips through the gate for the purpose of switching out cars for General Electric, Western Electric and Brace-Mueller-Huntley, and also to supply coal to Carrier and General Electric.[2] On March 11 a switch engine manned by a regular switching crew made one trip serving the three nonstruck corporations. It then returned, this time manned by supervisory personnel, with 14 empty boxcars. The pickets, being aware that these cars were destined for use by Carrier, milled around the engine from the time it reached the western side of Thompson Road, attempting to impede its progress. By inching its way across the road, however, the locomotive succeeded in reaching and entering the gate. After uncoupling the empties just inside the railroad right-of-way, for future use by Carrier, the engine picked up 16 more

---

[2] The union made no objection to the deliveries of coal to Carrier, since the nonstruck General Electric plant obtained its coal from Carrier.

cars which Carrier wanted shipped out and made its way back toward the gate. This time resistance from the picketing strikers was more intense. Some of the men stood on the footboard of the engine, others prostrated themselves across the rails and one union official parked his car on the track. Invective and threats were directed toward the operators of the train, and only after the pickets were dispersed by deputies of the Onondaga County sheriff's office was it able to pass.

Acting upon charges filed by Carrier, the Regional Director of the National Labor Relations Board issued a complaint against the international and local union organizations and individual officials of each, alleging violations of §§ 8 (b)(1)(A) and 8 (b)(4)(i) and (ii)(B) of the National Labor Relations Act. The Trial Examiner found the union in violation of both sections and recommended appropriate cease-and-desist orders. The National Labor Relations Board sustained the Examiner's finding that an unfair labor practice had been committed under § 8 (b)(1)(A) and entered an order accordingly. The union does not contest this determination by the Board. The Board further concluded, however, that the picketing was primary activity and therefore saved from § 8 (b)(4)(B)'s proscription by the proviso that "nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." Noting the conceded fact that the deliveries and removals by the railroad in this case were made in connection with the normal operations of the struck employer, the Board regarded as dispositive this Court's decision in *Electrical Workers Local No. 761* v. *Labor Board,* 366 U. S. 667, the *General Electric* case. 132 N. L. R. B. 127.

The Court of Appeals for the Second Circuit reversed the Board's decision on the ground that the picketing at the railroad gate was directed solely at the neutral rail-

road employees and could not be regarded as incident to what the court considered the only legitimate union objective: publicizing the labor dispute to the employees involved therein, those working for Carrier. This Court's holding in *General Electric* was deemed inapposite since the gate in the present case is located on premises belonging to the neutral employer. 311 F. 2d 135. Chief Judge Lumbard dissented. Because of the asserted conflict with *General Electric* and the importance of the problem to the national labor policy we granted certiorari. 373 U. S. 908. We reverse the decision of the Court of Appeals.

The activities of the union in this case clearly fall within clauses (i) and (ii) of § 8 (b)(4); likewise the objective, to induce the railroad to cease providing freight service to Carrier for the duration of the strike, is covered by the language of subsection (B), exclusive of the proviso. The question we have is whether the activities of the union, although literally within the definition of secondary activities contained in clauses (i) and (ii) of § 8 (b)(4), are nevertheless within the protected area of primary picketing carved out by Congress in the proviso to subsection (B).

The dividing line between forbidden secondary activity and protected primary activity has been the subject of intense litigation both before and after the 1959 amendments to § 8 (b)(4), which broadened the coverage of the section but also added the express exceptions for the primary strike and primary picketing. We need not detail the course of this sometimes confusing litigation; for in the *General Electric* case, *supra,* the Court undertook to survey the cases dealing with picketing at both primary and secondary sites and the result reached in that case largely governs this one. In the *General Electric* case, because the union's object was to enmesh "employees of the neutral employers in its dispute" with the primary

employer, the Board ordered the union to cease picketing a separate gate used exclusively by employees of certain independent contractors who had been doing work on the primary premises on a regular and continuous basis for a considerable period of time.   123 N. L. R. B. 1547.   In this Court, the Board conceded that when the struck premises are occupied by the primary employer alone, the right of the union to engage in primary activity at or in connection with the primary premises may be given unlimited effect—"all union attempts, by picketing and allied means, to cut off deliveries, pickups, and employment at the primary employer's plant will be regarded as primary and outside the purview of Section 8 (b)(4)(A)." [3] But the Board insisted that the facts presented a common situs problem since the regular work of the contractors was continuously done on the primary premises and hence the rules of the *Moore Dry Dock* case [4] should be applied.   The union, on the other hand, argued that no picketing at the primary premises should be considered as secondary activity.

The Court accepted the approach neither of the Board nor of the Union.   The location of the picketing, though important, was not deemed of decisive significance; picketing was not to be protected simply because it occurred at the site of the primary employer's plant. Neither, however, was all picketing forbidden where occurring at gates not used by primary employees.   The legality of separate gate picketing depended upon the type of work being done by the employees who used that gate; if the duties of those employees were connected with the normal operations of the employer, picketing directed at them was protected primary activity, but if

---

[3] Brief for the National Labor Relations Board, *Electrical Workers Local 761* v. *Labor Board,* No. 321, October Term, 1960, p. 31.

[4] *Sailors' Union of the Pacific,* 92 N. L. R. B. 547.

their work was unrelated to the day-to-day operation of the employer's plant, the picketing was an unfair labor practice. The order of the NLRB was vacated to permit determination of the case in accordance with the proper test.

It seems clear that the rejection of the Board's position in *General Electric* leaves no room for the even narrower approach of the Court of Appeals in this case, which is that the picketing at the site of a strike could be directed at secondary employees only where incidental to appeals to primary employees. Under this test, no picketing at gates used only by employees of delivery men would be permitted, a result expressly disapproved by the Court in *General Electric:* "On the other hand, if a separate gate were devised for regular plant deliveries, the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations." 366 U. S., at 680–681.

Although the picketing in the *General Electric* case occurred prior to the 1959 amendments to § 8 (b)(4), the decision was rendered in 1961 and the Court bottomed its decision upon the amended law and its legislative history.[5] We think *General Electric's* construction of the

---

[5] The Court said: "The 1959 Amendments to the National Labor Relations Act, which removed the word 'concerted' from the boycott provisions, included a proviso that 'nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.' 29 U. S. C. (Supp. I, 1959) § 158 (b)(4)(B). The proviso was directed against the fear that the removal of 'concerted' from the statute might be interpreted so that 'the picketing at the factory violates section 8 (b)(4)(A) because the pickets induce the truck drivers employed by the trucker not to perform their usual services where an object is to compel the trucking firm not to do business with the . . . manufacturer during the strike.' Analysis of the bill prepared by Senator Kennedy and Representative Thompson, 105 Cong. Rec. 16589." 366 U. S., at 681.

proviso to § 8 (b)(4)(B) is sound and we will not disturb it. The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved "primary picketing" from the secondary ban. Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt. In light of this traditional goal of primary pressures we think Congress intended to preserve the right to picket during a strike a gate reserved for employees of neutral delivery men furnishing day-to-day service essential to the plant's regular operations.[6]

Nor may the *General Electric* case be put aside for the reason that the picketed gate in the present case was located on property owned by New York Central Railroad and not upon property owned by the primary employer. The location of the picketing is an important but not decisive factor, and in this case we agree with Judge Lumbard that the location of the picketed gate upon New York Central property has little, if any, significance:

> "In this case, it is undisputed that the railroad's operations for Carrier were in furtherance of Carrier's normal business. It is equally clear from the record that the picketing employees made no attempt to interfere with any of the railroad's operations for plants other than Carrier. The railroad employees were not encouraged to, nor did they, refuse to serve the other plants. The picketing was designed to

---

[6] See H. R. Rep. No. 741, on H. R. 8342, 86th Cong., 1st Sess., 21, 80; H. R. Rep. No. 1147, on S. 1555, 86th Cong., 1st Sess., 38; 2 Leg. Hist. of the Labor-Management Reporting and Disclosure Act of 1959, 1575–1576, 1707, 1857.

accomplish no more than picketing outside one of Carrier's own delivery entrances might have accomplished. Because the fence surrounding the railroad's right of way was a continuation of the fence surrounding the Carrier plant, there was no other place where the union could have brought home to the railroad workers servicing Carrier its dispute with Carrier." 311 F. 2d 135, 154.

The railroad gate adjoined company property and was in fact the railroad entrance gate to the Carrier plant. For the purposes of § 8 (b)(4) picketing at a situs so proximate and related to the employer's day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier.

Carrier, however, has another argument: holding this picketing protected thwarts the purpose of the 1959 amendment to bring railroads within the protection of § 8 (b)(4). The definitions of "employer" and "employee" in §§ 2 (2) and 2 (3) of the Act specifically exclude "any person subject to the Railway Labor Act" and the employees of any such "person." Prior to 1959, § 8 (b)(4) prohibited secondary inducements to "the employees" of any "employer" and there arose a conflict of authority between the Board and several Courts of Appeals as to whether or not the secondary boycott provisions applied to any appeals to railroad employees.[7]

---

[7] Compare *International Brotherhood of Teamsters* (The International Rice Milling Co.), 84 N. L. R. B. 360; *International Woodworkers of America* (Smith Lumber Co.), 116 N. L. R. B. 1756; *International Brotherhood of Teamsters* (The Alling & Cory Company), 121 N. L. R. B. 315; and *Lumber & Sawmill Workers Local Union 2409* (Great Northern Railway Co.), 122 N. L. R. B. 1403, with *International Rice Milling Co.* v. *Labor Board*, 183 F. 2d 21 (C. A. 5th Cir.); *Smith Lumber Co.* v. *Labor Board*, 246 F. 2d 129 (C. A. 5th Cir.); *Great Northern Railway Co.* v. *Labor Board*, 272 F. 2d 741 (C. A. 9th Cir.).

Congress resolved this question in 1959 by revising § 8 (b)(4) to proscribe inducement of secondary work stoppages by "any individual employed by any person." There is no indication whatever that Congress intended by the revision to do more than to eliminate the uncertainty deriving from the words "employer" and "employee" and thereby to extend to railroads the same protections which other employers enjoyed. Our holding does not derogate from this equality of treatment. On the contrary, the rule for which Carrier contends would place the railroad on a better footing than all other employers who do business with the struck plant. It would distinguish between picketing an entrance to a struck plant which is owned by the primary employer and picketing a gate which by design or otherwise had been conveyed to a neutral furnishing delivery service, an anomaly which we do not believe Congress intended.

Finally, we reject Carrier's argument that whatever the rule may be in the ordinary case of separate gate picketing, the picketing of the railroad gate in this case was violative of § 8 (b)(4) because it was accompanied by threats and violence. Under § 8 (b)(4) the distinction between primary and secondary picketing carried on at a separate gate maintained on the premises of the primary employer, does not rest upon the peaceful or violent nature of the conduct, but upon the type of work being done by the picketed secondary employees. Such picketing does not become illegal secondary activity when violence is involved but only when it interferes with business intercourse not connected with the ordinary operations of the employer.[8] This is not to say, of course, that violent

---

[8] Compare *Labor Board* v. *Rice Milling Co.*, 341 U. S. 665, 672, in which the Court said: "In the instant case the violence on the picket line is not material. The complaint was not based upon that violence, as such. To reach it, the complaint more properly would

primary picketing is in all respects legal but only that it is not forbidden by § 8 (b)(4); it would escape neither the provisions of the federal law nor the local law if violative thereof.

This is all, we think, that was intended by the proviso to § 8 (b)(4) which provides that nothing in subsection (B) "shall be construed to make unlawful, *where not otherwise unlawful,* any primary strike or primary picketing." (Emphasis supplied.) It is possible to read this language to mean that the proviso does not save from proscription under § 8 (b)(4) union activity violative of other laws, but this interpretation would condemn as secondary conduct any and all picketing directed toward neutral employers so long as the conduct, as in the case of violence, was forbidden by some other law. In our view, the words "where not otherwise unlawful" were inserted only to make clear that the proviso, while excluding the conduct from the § 8 (b)(4) sanctions did not also legalize it under other laws, state or federal. The legality of violent picketing, if "primary," must be determined under other sections of the statute or under state law.

*Reversed.*

MR. JUSTICE DOUGLAS concurs in the result.

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.

---

have relied upon § 8 (b)(1)(A) or would have addressed itself to local authorities. The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained-of conduct into conflict with § 8 (b)(4). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt."