Samuel M. KAYNARD, Regional Director of Region 29 of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**LOCAL 804, DELIVERY AND WAREHOUSE EMPLOYEES, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,** Respondent.

Civ. A. No. 71 C 1697.

United States District Court, E. D. New York.

Feb. 7, 1972.

Samuel M. Kaynard by Howard Edelman, Brooklyn, of counsel, for petitioner.

Stanley M. Berman, Cohen, Weiss & Simon, New York City, for respondent.

Floyd S. Weil, for the B. F. Goodrich Co.

## OPINION

NEAHER, District Judge.

Petitioner, Regional Director of Region 29 of the National Labor Relations Board ("Board"), has applied for a temporary injunction against respondent pursuant to Section 10(*l*) of the National Labor Relations Act ("Act"), 29 U.S.C. § 160 (*l*). Respondent is the local labor union which represents warehouse employees at the Staten Island distribution center of The B. F. Goodrich Company ("Goodrich"). These employees have been on strike since October 20, 1971, after respondent and Goodrich failed to agree on a new labor contract.

On December 9, 1971 Goodrich filed a charge with the Board alleging that respondent has been engaging in unfair labor practices in furtherance of the strike by inducing and encouraging employees of other employers to refuse to transport or handle Goodrich products with the object of forcing those employers to cease doing business with, or performing services for, Goodrich. In seeking injunctive relief pending final disposition of the charge before the Board, petitioner asserts he has reasonable cause to believe the charge is true that respondent has been and is engaging in acts and conduct violating Section 8(b) (4) of the Act, 29 U.S.C. § 158(b) (4),[1]

---

1. Section 8 provides in pertinent part
(b) It shall be an unfair labor practice for a labor organization or its agents—
\* \* \* \* \*

(4) (i) . . . to induce or encourage any individual employed by any person engaged in commerce . . to engage in, a strike or a refusal in the course of his employment to . . .

and that a complaint thereon should issue.

Respondent filed an answer to the petition denying material allegations but admitting that beginning on or about December 7, 1971, and at various times thereafter, it engaged in picketing "in protest of the activities of" Goodrich, the Baltimore and Ohio Railroad ("B. & O."), and Byrnes Express and Trucking Co., Inc. ("Byrnes") in relation to Goodrich. This extended picketing, respondent contends, was aimed solely at what it calls "combined efforts of Goodrich, B. & O. and Byrnes to circumvent the strike and picketing of Goodrich" and was entirely permissible as lawful primary strike activity under well-established "common situs" and "ally" doctrines applicable to the situation here.

"In passing on a petition for a § 10 (l) injunction, the federal district court does not have the authority nor the responsibility of deciding whether respondent had committed the unfair labor practice charged. . . ." McLeod for and on Behalf of N. L. R. B. v. Local 25, International Brotherhood of Electrical Workers, 344 F.2d 634, 638 (2 Cir. 1965). Its function is limited to determining (1) whether the Regional Director has "reasonable cause" to believe the unfair labor charge is true, and (2) whether temporary injunctive relief would be "just and proper" in terms of general equitable principles. Id. at 638. As to the latter, the court must bear in mind that "[t]he preliminary injunction is of critical importance to participants in labor disputes, for it may have as great an effect upon the dispute as the ultimate outcome of the litigation." McLeod for

and on Behalf of N. L. R. B. v. Business Machine and Office Appliance Mechanics Conference Board, etc., 300 F.2d 237, 242 (2 Cir. 1962). To warrant injunctive relief, therefore, the court must find not only that "there is a reasonable possibility of the Board sustaining the unfair labor practice charge" but also reasonable cause to believe that such a decision will be enforced by the Court of Appeals. Id. at 241 and 243 n. 17.

After hearing the evidence of petitioner and respondent, summarized below, and mindful of the foregoing rules, the court finds (1) that petitioner has not demonstrated factual and legal support warranting injunctive relief against respondent's picketing activities at the South Avenue entrance to the B. & O. Arlington Yard; and (2) that petitioner has demonstrated such support warranting injunctive relief against respondent's picketing activities at the B. & O. Yard in Cranford, New Jersey, and at or in the vicinity of B. & O. freight cars located on railroad track in the Raritan Industrial Center, Edison, New Jersey.

Goodrich's distribution center, the situs of the labor dispute, is housed in a warehouse and office building situated on an open tract of land bordering Forest Avenue, Staten Island, N. Y. There truck, industrial and automobile tires, tubes, hose and related products received from various Goodrich factories are stored for consolidation and eventual export shipment to Goodrich plants or customers overseas.[2] These goods arrive at the distribution center by truck or rail. They are shipped out by truck for delivery to piers for overseas transportation. Until the strike that trucking serv-

---

transport, or otherwise handle . . . any goods, . . . or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce . . . where in either case an object thereof is—

\* \* \* \* \*

(B) forcing or requiring any person to cease . . . handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business

with any other person, . . . *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . .

2. The value of the goods shipped into and out of the Goodrich distribution center in interstate and foreign commerce is in excess of the $50,000 juridictional amount. (Hearing Transcript, p. 102.)

ice had been continuously performed for Goodrich by Byrnes, which handled 85 to 90% of the outgoing shipments after Goodrich discontinued using rail transportation to the piers some years ago.

The Goodrich employees now on strike, whose picketing activities give rise to this proceeding, were classified as "warehousemen" under the previous labor contract. Their normal and usual work consisted essentially of unloading incoming rail and truck shipments, storing the goods in proper inventory areas within the warehouse, and subsequently filling outgoing export orders from stock and moving them to the truck dock platform to be picked up by Byrnes' truckmen for delivery to the piers. To perform these tasks the warehousemen operated lift trucks and utilized pallets and cones, in addition to such manual handling of the goods as was required.

When the warehousemen went on strike last October they promptly began picketing the truck entrance to the Goodrich premises carrying signs reciting "B. F. Goodrich on strike, Local 804 IBT". That entrance is a driveway off Forest Avenue leading to the truck dock platform extending along one side of the warehouse. It is the only business entrance to the Goodrich premises. Except for the events hereinafter described, the picketing effectively blocked Byrnes and other truckmen from performing their normal services for Goodrich, since their employees would not cross the picket line.

Respondent's picket line at the front entrance, however, did not cut off rail shipments to the warehouse. These continued to arrive during October and November, although in decreased volume. The freight cars entered and left the Goodrich premises via a railroad spur terminating in a siding next to the warehouse on the side opposite to the truck dock and driveway. The spur track connects with B. & O. tracks in its Arlington yard, which is contiguous to the rear of the Goodrich premises. The surrounding area is swampy; there is no fence; a small creek forms a natural boundary between the B. & O. and Goodrich properties, which the spur track traverses over a culvert. It is, in effect, a rear entrance accessible only to freight cars.

During October and November Goodrich used the B. & O. spur to make some rail shipments out of the warehouse to points outside the State of New York. Supervisory personnel performed the loading and other work normally done by the striking employees. No export shipments were made, probably because of the warehousemen's strike but possibly also because of the longshoremen's work stoppage at the piers.

In early December, after the longshoremen returned to work, Goodrich attempted to resume export shipments to the piers. Arrangements were made with B. & O. to supply empty freight cars which were loaded at the siding by Goodrich supervisory personnel. B. & O. then hauled these cars over the spur to its team tracks in the contiguous Arlington yard, a distance from the Goodrich siding of about 500 yards. The B. & O. team tracks were a branching out of the main railroad tracks to facilitate delivery of freight to consignees who did not have individual sidings. Truckmen entered the team track area via South Avenue, a roadway off Forest Avenue about one-quarter mile distant from the Goodrich truck driveway. Trucks could pull up alongside the freight cars in Arlington yard, receive their freight and exit via South Avenue to Forest Avenue.

Goodrich requested Byrnes to have its trucks and drivers at the Arlington yard on December 7, 1971 to transfer Goodrich export shipments from four freight cars moved to the team tracks from the Goodrich siding and re-deliver those shipments to the piers. Byrnes employees entered the Arlington yard on that date via the South Avenue entrance, since there was then no picketing at that point, and began the transfer. They were interrupted, however, by the appearance of Goodrich striking employees who displayed a picket sign. Unquestionably the picketing induced, if not co-

erced,[3] Byrnes' employees to cease operations, with the result that only two of the four carloads got to the piers. Thereafter, Goodrich warehousemen in parked cars maintained surveillance at the entrance of the Arlington yard.

After the frustration of the Arlington yard arrangement, Goodrich devised a new routing for its export shipments, again utilizing B. & O. and Byrnes. Freight cars, loaded by supervisory personnel, left the warehouse siding via the spur, but outbound this time from the Arlington yard to B. & O.'s yard at Cranford, N. J., some 12 miles away. Byrnes agreed to have its trucks meet the freight cars at Cranford on December 9th, unload them and deliver the shipments to the piers. Again, respondent's intelligence apparatus was equal to the occasion. When the Byrnes truckmen arrived, two of Goodrich's striking employees were already there, prepared to picket if necessary. The sign they had with them, however, bore the additional statement in large letters "No dispute with any other employer". Conversation ensued, after which the Byrnes employees telephonically informed their employer they would not cross what they regarded as a picket line in order to handle the Goodrich shipments. Byrnes instructed them to return to its terminal and the Goodrich cars remained unloaded.

Undaunted, Goodrich tried again. About December 20th arrangements were made with the Raritan Industrial Center, Edison, N. J., for the use of team tracks at that privately-owned location. B. & O. moved the unloaded cars at its Cranford yard to the Raritan Center together with additional cars loaded at Goodrich's siding. On December 27th Byrnes, at Goodrich's request, dispatched trucks and drivers to the Raritan Center to pick up the Goodrich shipments and deliver them to piers. Again the Byrnes employees met striking Goodrich employees

who apparently had followed the Byrnes trucks. The revised picket sign became visible, there was conversation, and again the Byrnes employees refused to proceed. They returned to their terminal and subsequently Byrnes informed Goodrich that its employees would not handle the carloads at Raritan. Byrnes has not furnished trucking service to Goodrich since that time.

There is no question that the situs of dispute in this case is the Goodrich warehouse and its normal operations. As already noted, a principal part of those operations is the consolidation and movement out of the warehouse of Goodrich products destined for overseas customers. B. & O. normally plays no part in that movement. Essential to it, however, is truck transportation from the warehouse to the piers, a service performed by another neutral employer, *i. e.*, Byrnes. The evidence compels a finding that respondent engaged in picketing activities at B. & O.'s Arlington and Cranford yards and at the Raritan Industrial Center with the sole object of cutting off trucking services essential to start Goodrich's export shipments on their way, and that respondent has succeeded. The critical question is whether such picketing is forbidden secondary activity, as petitioner asserts, or is lawful primary picketing, as respondent contends.

With all deference to petitioner's expertise, and aware of the limited judicial role in a § 10(*l*) proceeding, the court is of opinion that respondent's activity at the entrance to B. & O.'s Arlington yard was lawful primary picketing under the criteria established in United Steelworkers of America, AFL–CIO v. N. L. R. B., 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), and Local 761, International Union of Electrical, Radio and Mach. Workers, AFL–CIO v. N.L.R.B., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).[4]

3. Byrnes' employees are members of Local 816 of the same international union as respondent. They undoubtedly reacted in part to threats by respondent's members to invoke union sanctions against them.

4. This was also the opinion of Judge Bartels of this court in a matter before him arising out of the same Arlington yard picketing. Goodrich, on December 13, 1971, commenced an action against re-

Of some significance here, *Steelworkers, supra,* upheld a ruling of the Board which had been reversed by the Court of Appeals for this Circuit, then Chief Judge Lumbard dissenting. Carrier Corporation v. N. L. R. B., 311 F.2d 135 (2 Cir. 1962). The Board had held that striking employees of Carrier Corporation could lawfully picket a gate to railroad property with the purpose of inducing railroad employees not to deliver or remove freight cars used by Carrier on its adjacent plant property. The basis for the Board's ruling was stated by the Supreme Court, 376 U.S. at 495, 84 S.Ct. at 902, as follows:

> Noting the conceded fact that the deliveries and removals by the railroad in this case were made in connection with the normal operations of the struck employer, the Board regarded as dispositive this Court's decision in Local 761, Intern. Union of Elec., Radio & Machine Workers, etc. v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592, the General Electric case. 132 N.L.R.B. 127.

The Court, rejecting the majority view in the Court of Appeals, refused to limit picketing solely to "publicizing the labor dispute to the employees involved therein, those working for Carrier." *Id.* at 496, 84 S.Ct. at 902. It pointed out that in Local 761, International Union Electrical Workers, AFL–CIO, *supra,* the Court had already held picketing not forbidden "where occurring at gates not used by primary employees." *Id.* at 497, 84 S.Ct. at 903. Pointing out again that "[t]he location of the picketing, though important, was not deemed of decisive significance," the Court formulated the criterion in these terms, *id.* at 497–498, 84 S.Ct. at 903:

> The legality of separate gate picketing depended upon the type of work being done by the employees who used that gate; if the duties of those employees were connected with the normal operations of the employer, picketing directed at them was protected primary activity, but if their work was unrelated to the day-to-day operation of the employer's plant, the picketing was an unfair labor practice.

The Byrnes employees in Arlington yard were clearly carrying on work related to the normal day-to-day operation of Goodrich. The close analogy between the picketing situation here and that in *Steelworkers, supra,* is apparent from the Court's quotation of a portion of Chief Judge Lumbard's dissenting opinion, whose view the Court adopted:

> "In this case, it is undisputed that the railroad's operations for Carrier were in furtherance of Carrier's normal business. It is equally clear from the record that the picketing employees made no attempt to interfere with any of the railroad's operations for plants other than Carrier. The railroad employees were not encouraged to, nor did they, refuse to serve the other plants. The picketing was designed to accomplish no more than picketing outside one of Carrier's own delivery entrances might have accomplished." *Id.* at 499–500, 84 S.Ct. at 904.

The Supreme Court's succinct description in *Steelworkers, supra,* fits this case exactly, *id.* at 500, 84 S.Ct. at 904:

> The railroad gate adjoined company property and was in fact the railroad

---

spondent for an injunction and damages in the New York Supreme Court, Richmond County. That action was removed to this court as involving a labor dispute subject to federal jurisdiction. B. F. Goodrich Co. v. Local 804, etc., E.D.N.Y. Civil Action No. 71–C–1626. Judge Bartels remanded the case to the State court but stated, in an unreported ruling, that:

> It is the decision of this court that the picketing of the yard with respect to the Byrnes Express Company is really aimed at the primary employer

and not at the secondary employer, and that the thrust of the case as set forth in the complaint is violence over which this court has no jurisdiction. In support of this conclusion, reference is made to United Steelworkers of America v. NLRB, 376 US 492 [84 S.Ct. 899, 11 L.Ed.2d 863] (1964) where, on similar facts the Supreme Court denied the existence of a secondary boycott. (Tr. of Hearing, Dec. 23, 1971, pp. 8–9.)

entrance gate to the Carrier plant. For the purposes of § 8(b)(4) picketing at a situs so proximate and related to the employer's day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier.

In the instant case petitioner concedes that

"this change of loading procedures from trucks to railroad cars has not materially altered Goodrich's basic warehouse operation . . . that the only difference in the post-strike railroad operation as against the pre-strike operation is that Goodrich is now unloading its warehouse onto B. & O. cars for subsequent loading by Byrnes." [5]

This illustrates precisely respondent's point: that the joint action of Goodrich and B. & O. extended the situs of dispute to Arlington yard whose only exit on South Avenue was a "back door" for Byrnes' trucks until picketing started.

Nowhere in his brief does petitioner deal with this common situs aspect of the Arlington yard picketing or even mention the *Steelworkers* and *Local 761* cases, *supra.* Instead, petitioner, anticipating that respondent would argue the application of the "ally" doctrine, devotes his entire argument to demolishing that contention. But the Board's own standards "widely accepted by reviewing federal courts," *Local 761, International Electrical, Radio and Mach. Workers, supra,* 366 U.S. at 677, 81 S.Ct. at 1291, validate the Arlington yard picketing: (1) respondent limited its picketing to times when the warehouse unloading activity had moved to Arlington yard; (2) Goodrich was concededly engaged in its normal business at that situs; (3) the picketing was reasonably close to the situs; and (4) the picketing clearly disclosed that the dispute involved only Goodrich.

A recent Board decision, relied on by petitioner, requires comment, *i. e.,* Local 61, International Chemical Workers Union (Sterling Drug, Inc.), 189 NLRB No. 11 (1971). While urged in opposition to respondent's "ally" contentions, the case bears some resemblance to Goodrich's efforts to avoid the impact of the warehousemen's strike. Sterling, a pharmaceutical manufacturer at Rensselaer, N. Y., maintained its own warehouse on the plant premises to store materials needed for manufacturing operations and also to store finished products. Its manufacturing and maintenance employees went on strike and picketing soon reduced the flow of supplies, most of which were brought in by truck. Sterling, however, had no difficulty with incoming rail shipments. This prompted Sterling to arrange with Vogel Van and Storage, Inc., an independent company in Albany, N. Y., to have Vogel receive truck shipments of materials for Sterling, transfer them to railroad cars and then route them to Sterling's plant, where they were unloaded by Sterling employees who were not on strike. This arrangement lasted only a short time. The striking Sterling employees picketed Vogel's place of business and Vogel terminated the arrangement because of it.

Sterling filed an unfair labor practices charge and the matter was accelerated for findings, conclusions and decision directly by the Board. The Board ruled that Vogel was "a neutral employer who was not doing any struck work for Sterling", and therefore not an ally, and that the union had violated § 8(b)(4)(i) and (ii) of the Act in picketing Vogel's place of business.

The Sterling case is clearly inapposite here with respect to the Arlington yard picketing. There was no common situs as between Sterling's plant and Vogel's warehouse across the Hudson in Albany. More importantly, as the District Court noted in a § 10(l) proceeding:

There were no outgoing shipments, or preparation for such, of the Sterling deliveries rerouted to Vogel.

Vincent v. Chemical Workers, Local 61, 64 CCH LC § 11,245 at p. 19,858 (N.D. N.Y.1970).

5. Memorandum of Points and Authorities in Support of Petition for Injunction, etc., p. 7.

On relatively undisputed facts and in light of the governing precedents, the court is unable to perceive reasonable cause for believing that the Board would find the Arlington yard picketing in violation of § 8(b) (4), or that the Court of Appeals would enforce its decision if the Board so decided.

Respondent's picketing at B. & O.'s Cranford yard and at the Raritan Industrial Center presents a situation not comparable to that at Arlington yard. The loaded freight cars moved to the team tracks next door were going nowhere as rail shipments. Goodrich simply used its siding and spur to enable Byrnes to make its pickups via the South Avenue entrance, thus avoiding the picket line at Goodrich's Forest Avenue entrance.

■ Although respondent urges application of the same "common situs" logic, the facts of the Cranford and Raritan Center shipments appear sufficiently different to support reasonable cause to believe that respondent violated § 8(b) (4). Goodrich's rail shipments to Cranford and then to Raritan at Edison were made on regular bills of lading. Both points are in New Jersey, a considerable distance from Goodrich's warehouse on Staten Island. That this roundabout routing was devised to avoid the impact of the strike and may lessen the effectiveness of the picketing at the warehouse situs would not preclude the Board from finding respondent had engaged in unlawful secondary picketing at Cranford and Raritan Center. See Local 810, Steel, Metals, Alloys and Hardware Fabricators, etc. (Fein Can Corp. and Advance Trucking Corp.), 131 NLRB 59, 71, enforcement granted 299 F.2d 636 (2 Cir. 1962). The Board, not the court, is given the primary jurisdiction to find the facts and evaluate them in the light of national labor policy. Enough has been shown at this stage to warrant the granting of temporary injunctive relief which will limit respondent's picketing activities to the immediate area of the Goodrich distribution center including the proximately located entrance to the team tracks at B. & O.'s Arlington yard.

■ One further matter which developed at the hearing requires mention. Some conflict appears in the testimony as to the extent to which the striking warehouse employees participate with Byrnes' employees in the loading of export shipments on Byrnes' trucks. Goodrich witnesses on strike testified that huge truck tires and heavy cases or cartons are placed on the trucks by Goodrich warehousemen using forklifts, pallets and sometimes cones, since such items could not be manually loaded by Byrnes' truckmen. Byrnes' witnesses minimized the warehousemen's truck loading activities in terms of cooperative assistance rendered on occasion. Respondent argues that the arrangement devised by Goodrich, with the cooperation of B. & O. and Byrnes, requires Byrnes to perform struck work, i. e., the unloading of freight cars and the placing of the export shipments on to Byrnes' trucks. This, says respondent, is shown by the conflicting testimony adverted to and makes B. & O. and Byrnes "allies" of Goodrich who are not entitled to the protection of § 8(b) (4).

There is no dispute that the outgoing rail shipments are loaded aboard the freight cars at the warehouse by Goodrich supervisory employees. Such loading is not normally done by the striking warehousemen because rail shipment to the piers as a day-to-day operation was discontinued years ago. Assuming that Byrnes' employees would have been called upon to unload, or assist in unloading, the freight cars routed to Cranford and Raritan Center, so as to transfer their contents to Byrnes trucks, they would not have performed work which otherwise would have been done by the striking warehousemen. The latter's loading activities are confined to the warehouse area; they did not handle the Goodrich shipments in any way *during* the course of transportation. Both B. & O. and Byrnes are common carrier transportation companies; neither performed any service substituting for services rendered by respondent's members. The "ally doctrine" precedents relied on by

**478**

respondent are therefore inapposite since all deal with situations where the employer secured others to do his work.

Except as indicated above, the court finds that petitioner has reasonable cause to relieve that respondent has engaged in, and is engaging in, a violation of § 8 (b) (4) of the Act and concludes that a temporary injunction should be issued pursuant to § 10(l) of the Act. Separate findings of fact and conclusions of law and an order granting temporary injunction have been signed in accordance with this opinion.