**ANCHORTANK, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–3230.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1979.

---

Andrews, Kurth, Campbell & Jones, Clinton S. Morse, James V. Carroll, III, Houston, Tex., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Stephen Mayer, Atty., N. L. R. B., Washington, D. C., for respondent.

James R. Watson, Jr., Houston, Tex., for Oil, Chemical, etc.

Before GOLDBERG, AINSWORTH and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge.

Petitioner Anchortank, Inc. [Anchortank] appeals the decision of the NLRB [Board] affirming the dismissal by administrative law judge of petitioner's claim of unfair labor practices under § 8(b)(4), 29 U.S.C. § 158(b)(4), of the National Labor Relations Act [Act]. Because we determine that the picketing complained of was protected primary activity, we affirm the Board.

I. *FACTS*:

Anchortank is in the business of storing chemicals, mainly petro-chemicals. Typically, the chemicals arrive by pipe, tank truck, railroad, barge and ocean-going vessels and are stored until, at the owner's directions, Anchortank transfers the material to the conveyance of owner's choice for further transportation. Ownership of the material does not pass to Anchortank, which operates solely as a storage facility.

Anchortank is located on the Gulf of Mexico at Texas City, Texas. Abutting Anchortank's property is Dock 16, a public dock for ocean-going vessels, owned by Texas City Terminal Railroad Company. Anchortank and two other businesses (Texas City Refining Company and Marathon Oil Company) make primary use of Dock 16 to load and unload cargo for ocean-going vessels. By virtue of a lease agreement, only one company may use the dock at any particular time. Moreover, it would be impossible for more than one to make beneficial use of the dock at any one time. Other firms use the dock on an occasional basis.

There are two means of access to Dock 16; a private Anchortank ramp leading from Anchortank's property and used solely by Anchortank employees when loading chemicals, and a second concrete ramp extending to the dock from a public access road. Those using the ramp from the public access road include employees of the ship, federal and local officials, various vendors of the vessel and pilots.

By law as well as custom, a pilot[1] licensed by the State is required to direct the ship from the Gulf to the dock and to take the ship from the dock out to sea. These pilots are members both of the Galveston-Texas City Pilots and the Master Mates and Pilots Union Local 100, affiliated with the International Association of Master Mates and Pilots.

Preceding the occurrence of the unfair labor practices alleged herein, the respondent union, the Oil, Chemical and Atomic Workers International and its Local 4-449 [Union] had been engaged in an organizational campaign at the Anchortank facility. The Board had held a representation election but had withheld certification of the local because of alleged balloting irregularities. As of September 20, 1977, Anchortank had neither recognized the union nor had the union been certified by the Board. On September 20, however, the union struck Anchortank alleging unfair labor practices and began picketing at the main entrance of the Anchortank facility. The picket signs read: "OCAW ON STRIKE, Unfair Labor Practices."

Prior to September 20, an official of the Union had contacted the representative of the Pilots Association and the Pilots local to inform the pilots of the intended strike and to advise that the Union intended to picket ships berthing at Dock 16. When asked if the pilots would observe the picket line, the pilots' representative stated only that he would probably observe the line.

On September 21, the union began picketing at the base of the concrete ramp leading to the dock from the public access road. The signs carried bore the same legend as those carried at the main entrance. The

---

1. Because we hold that Dock 16 was part of Anchortank's primary situs and the pilots were performing work related to Anchortank's everyday business, it is not necessary for us to determine whether the pilots are independent contractors or employees of a neutral employer.

picketing continued whenever there was a ship at the dock loading Anchortank material. The union did not picket, however, when Dock 16 was empty or when a company other than Anchortank was using Dock 16.

On September 25, the union began to picket the dock from the water in a small motor driven craft. Initially the boat picketed a ship already docked but later picketed to prevent other ships from entering Dock 16. Displayed from the boat was a sign reading "To the Public, OCAW Local 4–449 on Strike Against Anchortank. OCAW Local 4–449 does not have a dispute with any other employer." [2]

As a result of this new picketing technique, the pilots met to discuss the situation and agreed to honor the picket line at the ramp of Dock 16. The pilots also agreed that their representative ask that the union issue the pilots passes so they might cross the picket line with impunity. This request was denied. Therefore, the pilots refused to assist vessels scheduled for Anchortank's use from arriving at or departing from Dock 16.

On October 6, 1977, the Board obtained a temporary restraining order from the United States District Court for the Southern District of Texas based on alleged violation of § 8(b)(4) of the Act. The restraining order enjoined the union from preventing the pilots performing their customary duties in connection with vessels arriving or departing from Dock 16. Consequently, the pilots informed all affected parties that they would recommend providing the normal pilotage service. The pickets at the concrete ramp to Dock 16 began carrying signs identical to the one displayed from the picket boat.

The instant case had its genesis in the charges filed by Anchortank that the respondent union violated §§ 8(b)(4)(i) and (ii)B of the Act by the picketing and related activity. The General Counsel, finding merit in Anchortank's contention, issued a complaint against the union. After a hearing the administrative law judge concluded that no secondary picketing had occurred and found in favor of the union. Upon appeal, the Board adopted the findings of

2. The petitioner also claims that the union violated § 8(b)(4) by one specific occurrence involving the picket boat, such event occurring on September 25. The petitioner claims that "on September 25, the Bow Queen, a sister ship of the Bow Rogn, docked at Dock 16 for Anchortank. In addition to picketing at the base of the concrete ramp to Dock 16 (Tr. 155–156, C.P. Ex.'s 1–3), the Respondent Unions also commenced picketing the vessel from a small motor driven craft which began to patrol back and forth in the water parallel to the Bow Queen on its outboard side as the vessel was preparing to sail (Tr. 40, 145–146). Mr. David Nible, a representative of the International, was in the boat displaying a picket sign which read, 'To the Public OCAW Local 4–449 on Strike against Anchortank. OCAW Local 4–449 Does Not Have a Dispute with Any Other Employer' (Tr. 17, G.C. Ex. 2). The patrol boat continued to picket in this fashion until harbor towboats arrived to assist it in the vessel's departure. At that time, the picket boat quit making parallel movements alongside the ship and positioned itself in between the towboats and the Bow Queen and at the same time, persons in the patrol boat were shining a light on the picket sign to illuminate it and waving it at the towboats (Tr. 21, 162). When the pilot that was assigned to steer the Bow Queen clear of the harbor arrived at Dock 16, he decided that rather than cross the respondent unions' picket line at the foot of the concrete ramp, he would board one of the tugs and off-load directly from the tug to the Bow Queen after it had cast off (Tr. 90–91). However, after the Bow Queen had cast off and the towboats were coming forward to assist her, the union patrol boat continued to picket between the tugs and the vessel for about five minutes (Tr. 21, 146). During this entire period, persons in the patrol boat continued to display their picket sign (Tr. 147)."

Petitioner contends that this conduct constitutes a separate violation of § 8(b)(4) because the union was attempting to influence the tugs to not do business with a neutral employer, the owner of the Bow Queen. Although we could dispose of this contention by holding that the tugs, also, were performing a service to Anchortank intimately related to its normal business, *Carrier, infra*, it is apparent that, viewing the record as a whole, the union did not, as a matter of fact, picket the tug boats. Although the patrol boat did linger for five minutes, the record discloses that this resulted not from an intent to prevent the tugs from assisting the Bow Queen, but rather because the union representative was not aware, because of poor visual conditions, that the Bow Queen had departed from the dock.

fact and conclusions of law of the administrative law judge and dismissed the complaint. Anchortank appealed to this Court as provided by § 10(e) of the Act, 29 U.S.C. § 160(e).

II. *ANALYSIS*:

Section 8(b)(4) of the Act provides that a union commits an unfair labor practice if it or its agents act:

(i) . . . to induce or encourage any individual employed by any person . . to engage in, a strike . . . ; or (ii) to threaten, coerce, or restrain any person . . . where in either case an object thereof is:

\* \* \* \* \* \*

(B) forcing or requiring any person . . to cease doing business with any other person . . . ; Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

■ Construed strictly, these provisions would condemn any union attempt to picket an employer in furtherance of a primary strike. Therefore, this section must be interpreted liberally in order to implement "the dual Congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building and Construction Trade Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Of course, a neutral employer's business with an employer who is the target of primary activity will be affected insofar as the targeted employer's business dealings are disrupted by primary activity. Thus in discussing the parameters of primary activity the Supreme Court stated:

The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved "primary picketing" from the secondary ban. Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is *selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt.* [Emphasis supplied] *United Steelworkers v. NLRB,* 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964).

Indeed, the union probably hopes that the picketing shall induce the employees of neutrals not to do business with the struck employer: "It is clear that, when a union pickets an employer with whom it has a dispute, it hopes, even if it does not intend, that all persons will honor the picket line, and that hope encompasses the employees of neutral employers who may in the course of their employment (deliverymen and the like) have to enter the premises." *Seafarers International Union v. NLRB,* 105 U.S. App.D.C. 211, 217, 265 F.2d 585, 591 (1959).

What distinguishes proscribed secondary activity from protected primary activity is the object of picketing or, equivalently, the identity of the target of the union activity. Thus, "picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer." *Electrical Workers v. Labor Board,* 366 U.S. 667, 673, 81 S.Ct. 1285, 1289–1290, 6 L.Ed.2d 592 (1961) citing *NLRB v. International Rice Milling,* 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951). Therefore, the issue before this Court is whether the conduct complained of was primary activity aimed at Anchortank or aimed at a neutral party for the purpose of inducing that party to bring pressure to bear on Anchortank.

Anchortank advances several theories under which the union conduct would constitute secondary activity in contravention of § 8(b)(4). First Anchortank contends that Dock 16 was a common situs within the meaning of *Moore Dry Dock,* 92 NLRB 547 (1950), and that the failure of the union to

meet the criteria enumerated in *Moore Dry Dock*[3] requires a determination that the conduct[4] is secondary and hence unlawful under § 8(b)(4). Alternately, even if the dock is not a common situs, Anchortank urges that picketing is still secondary because it occurred at a reserved gate and the departing vessels were not engaged in activity related to Anchortank's normal operations. In addition, Anchortank contends the non-situs appeals to the Pilot Association and pilots union constitute an independent ground of unlawful secondary activity.

### A. COMMON SITUS:

Anchortank's first theory lacks merit, not because the *Moore Dry Dock* standards were observed, but because Dock 16 was not a common situs. Anchortank claims that Dock 16 is a common situs under alternative factual theories: (1) two other companies also use the dock facilities and (2) the vessel's owner, an entity in its own right, uses the dock for services unrelated to Anchortank's business. These facts fail, however, to transform Dock 16 into a common situs, because *Moore Dry Dock* and its Fifth Circuit progeny,[5] hold that to be a common situs the area must not be the primary situs of the struck employer *and* neutral employers must be present at the time of the picketing.

That others *may* use the dock at times when Anchortank is not using the dock is insufficient. It was factually established that the picketing occurred *only* when a vessel dealing with Anchortank was either berthed or about to berth at Dock 16. Because the use of Dock 16 is exclusive, no neutral employers were present at the time of the picketing. Thus, the evil which Congress sought to proscribe, the bringing of pressure to bear on neutrals, was not present. Although Anchortank contends that had the union been successful in tying up a ship at the dock, the usage by the other firms would have been prevented, this factual situation neither occurred, threatened to occur, nor was intended to occur. Because the picketing occurred only when the dock was used for Anchortank's benefit and no other entity was threatened, the mere specter of abuse would not transform Dock 16 into a common situs.

Anchortank's second common situs theory, that Dock 16 is owned by a third party and that the ocean-going vessel, through its owner, was a neutral employer present during picketing, is completely foreclosed by *United Steel Workers v. NLRB (Carrier Corp.),* 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964). *Carrier* involved the picketing of a railroad spur in support of a primary strike. Although the railroad spur was located on railroad property, was used *solely* by railroad employees, and serviced businesses other than the primary employer from the same spur, the Supreme Court nevertheless held that the picketing was protected primary activity and inferentially rejected the argument that the situation presented a common situs situation to which *Moore Dry Dock* would apply. *Id.* at 500, 84 S.Ct. 899. The Supreme Court, adopting the reasoning of Judge Lumbard of the Second Circuit, determined that the location and ownership were of little importance:

" 'In this case, it is undisputed that the railroad's operations for Carrier were in furtherance of Carrier's normal business.

---

**3.** The four standards that must be met under *Moore Dry Dock* are: (1) that the picketing be limited to times when the situs of the dispute is located on the secondary premises, (2) that the primary employer be engaged in its normal business at the situs, (3) that the picketing takes place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute is only with the primary employer.

**4.** Specifically, Anchortank contends that the *Moore Dry Dock* standards were not met because (1) picketing of the dock occurred when no *employee* of Anchortank was present and (2) the ramp picket sign did not disclose the limited scope of the strike. Because we hold that the dock was not a common situs within *Moore Dry Dock,* we do not reach the issue of compliance with the *Moore Dry Dock* criteria.

**5.** *E.g., Linbeck Construction Corp. v. NLRB,* 550 F.2d 311 (5 Cir. 1977); *Ramey Construction Co. v. Painter's Local 544,* 472 F.2d 1127 (5 Cir. 1973); *Markwell & Hartz, Inc. v. NLRB,* 387 F.2d 79 (5 Cir. 1967), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

It is equally clear from the record that the picketing employees made no attempt to interfere with any of the railroad's operations for plants other than Carrier. The railroad employees were not encouraged to, nor did they, refuse to serve other plants. The picketing was designed to accomplish no more than picketing outside one of Carrier's own delivery entrances might have accomplished. Because the fence surrounding the railroad's right of way was a continuation of the fence surrounding the Carrier plant, there was no other place where the union could have brought home to the railroad workers servicing Carrier its dispute with Carrier.' 311 F.2d 135, 154.

The railroad gate adjoined company property and was in fact the railroad entrance to the Carrier plant. For the purposes of § 8(b)(4) picketing at a situs so proximate and related to the employers day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier." 376 U.S. at 499–500, 84 S.Ct. at 904.

■ In the same fashion: (1) Dock 16 was contiguous to Anchortank's property and leased by Anchortank, (2) no attempt was made to interfere with the operations of the other "shares" of Dock 16, (3) no other place was suitable to publicize the dispute with Anchortank to the vessel's employees and pilots, (4) the dock was, in fact, the vessels' entrance to the Anchortank facility and (5) the situs was related to Anchortank's everyday activity of receiving and loading chemicals. Therefore, we hold that the situs must be considered primary for the purpose of determining whether secondary activity occurred and *Moore Dry Dock* does not apply.[6]

## B. *ACTIVITY OF VESSEL:*

Anchortank further contends that the picketing was secondary because it occurred at a secondary entrance used exclusively by employees of ocean-going vessels and others and that the vessels were not furthering Anchortank's business, relying upon *Local 761 Electric Workers (General Electric Company) v. NLRB*, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). *General Electric Company* involved picketing in furtherance of a primary dispute at a secondary entrance to the primary situs. This secondary entrance was used exclusively by the employees of independent contractors engaged to perform repair, new construction and general maintenance for the primary employer. Although the Supreme Court remanded on the factual issue of the nature of work performed by the independent contractors, it held that picketing at a gate used solely by employees of subcontractors engaged in work wholly unrelated to the normal operations of the primary target would be secondary activity proscribed by § 8(b)(4)B.

■ Assuming that petitioner is correct in contending that the ramp and the entire dock is a separate "gate" within the meaning of *General Electric Company*, Anchortank has failed to demonstrate that the vessels were performing work unrelated to Anchortank's normal business. Common sense dictates otherwise. Although Anchortank neither owns the material shipped nor engages the services of the transporting vessel, such shipping is clearly a part of its daily business, for without the access to transportation, Anchortank could not engage successfully in the business of storage of chemicals. Additionally, although Anchortank does not own the goods, Anchortank employees regularly transfer the chemicals to and from the vessels and it would be ignoring reality to hold that it is part of Anchortank's regular business to load and unload vessels for storage, but not part of Anchortank's regular course of business for the same vessels to arrive and

---

**6.** Anchortank argues that not only pilots were interfered with by the picketing but also vendors, maintenance workers and repairmen were prevented from servicing the vessel. Because these were neutral employers *not* engaged in Anchortank operations but rather in the vessel's operations, the Dock is a common situs. The administrative law judge held that this issue was insufficiently litigated. After reviewing the record, we accept this as a holding that Anchortank failed to meet its burden of proof on this factual issue.

depart. We accordingly hold that the ships arriving and departing from Dock 16 were in furtherance of Anchortank's normal business operations and that the picketing was, therefore, primary activity.

### C. COMMUNICATIONS TO PILOTS ASSN.:

Finally, Anchortank argues that the letters and communications from the union to the Pilots Association form a separate § 8(b)(4) violation. Because we have determined that the dock must be considered part of the primary situs of Anchortank for the purposes of 8(b)(4) of the Act, Anchortank's final contention must fail also. A striking union may supplement its picketing of the premises with non-situs requests to honor the picket line directed to the same employees who ordinarily would encounter the pickets. *Interborough News Co.*, 90 NLRB 2135, 2149–2150. These appeals will not constitute secondary activity if they are in furtherance of the primary strike and are limited to requests that the employees refuse to perform services at the primary employer's premises. *Teamster Local No. 379*, 211 NLRB 629, 633 (1974). In the instant case, the request to the pilots was to honor the picket line by not bringing in nor taking out vessels for Anchortank at Dock 16. Because these requests accomplished no more than the picket line and were intended to further the primary strike rather than to encourage the pilots to refuse to perform all piloting services regardless of destination or to bring pressure to bear on Anchortank, we hold that such non-situs appeals do not violate § 8(b)(4).

Therefore, because Dock 16 is not a common situs and the ocean-going vessels arrived and departed from Dock 16 in furtherance of Anchortank's normal business operations, and because the off-situs communications were in furtherance of the union's primary activity, we hold that the union's picketing of the dock and ramp did not violate § 8(b)(4) and accordingly affirm the Board's dismissal of the instant complaint.

AFFIRMED.