**HUBER AND ANTILLA CONSTRUCTION, Plaintiff-Appellee,**

v.

**CARPENTERS LOCAL 470, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFLCIO, Defendant-Appellant.**

**No. 80–3022.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1981.

Decided Oct. 22, 1981.

Rehearing and Rehearing En Banc Denied Dec. 11, 1981.

Kathy L. Krieger, Asst. Gen. Counsel, Washington, D. C., F. G. Enslow, Griffin & Enslow, P. S., Tacoma, Wash., for defendant-appellant.

Bruce P. Bishof, Sunriver, Or., argued, for plaintiff-appellee; Monte E. Hester, Binns, Petrich, Hester & Robson, Tacoma, Wash., on brief.

Before WRIGHT, SCHROEDER and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Carpenters Local 470, United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("Union") appeals from the district court judgment awarding Huber and Antilla Construction ("Huber and Antilla") damages for losses caused by construction delays that resulted from Union picketing. The district court held that the Union's picketing of Huber was unlawful.

For the reasons set forth below we conclude that the picketing was lawful and, therefore, the Union is not liable for the losses suffered by Huber.

## PERTINENT FACTS

Huber and Antilla is a general contractor. In May of 1974 Huber and Antilla commenced construction of a 50-unit apartment project. It's employees did the carpentry and other general labor. Huber and Antilla also engaged approximately 16 contractors for the project.

On July 11, 1974, the Union commenced picketing the project with signs that stated: "Huber Antilla Construction, Unfair, Local 470, substandard wages and conditions,

AFL–CIO." Huber and Antilla did not have a collective bargaining agreement with the Union.

On July 17, 1974, Huber and Antilla notified the Union by telegram as follows:

THIS IS TO ADVISE THAT HUBER AND ANTILLA CONTRACTORS HAVE ESTABLISHED A RESERVED GATE FOR ALL UNION SUBCONTRACTORS AT ITS GIG HARBOR APARTMENT CONSTRUCTION SITE. THE RESERVED GATE HAS BEEN SET UP ON FOSTER STREET AND IS CLEARLY IDENTIFIED. ANY PICKETING IN THE VICINITY OF THIS RESERVE GATE WILL CONSTITUTE A VIOLATION OF SECTION 8(b)(4) OF THE LABOR MANAGEMENT RELATIONS ACT. ALSO BE ADVISED THAT THE EMPLOYER WILL SEEK DAMAGES IN COURT FOR ANY WORK STOPPAGE UNDER SECTION 303 OF THE ACT.

Donald B. Antilla, a partner of Huber and Antilla, testified that the reserve gate was for "union subcontractors and materials members." The reserve gate was located on the east end of Foster Street. A separate entrance for Huber and Antilla employees was initially located on Stinson Avenue. This gate was later moved to the west end of Foster street [hereinafter referred to as the non-union gate].

Huber placed a sign on the non-union gate which read:

THIS GATE RESERVED EXCLUSIVELY & SOLELY FOR EMPLOYEES OF HUBER & ANTILLA CONSTRUCTION & NON UNION SUB CONTRACTORS & NON UNION MATERIAL & DELIVERY MEN LISTED BELOW—COAST STEEL PRODUCERS, SOUND BUILT PLYWOOD—*UNION* SUB CONTRACTORS *MATERIAL & DELIVERY MEN* SHALL NOT USE THIS GATE. (emphasis added).

Signs were also located on the reserved gate. The original sign read:

RESERVED ENTRANCE FOR UNION SUBCONTRACTORS ONLY.

This sign was replaced by one containing these words:

THIS GATE RESERVED EXCLUSIVELY AND SOLELY FOR UNION SUBCONTRACTORS LISTED BELOW:

Peninsula Light Co.; Nelson Construction of Ferndale; Myers Corp.; Tacoma Plumbing & Heating, Inc.; Lindsay Electric Co.; Totem Pacific Enterprises, Inc.; Van Court & Matthews, Inc.; Gherke Masonry; Spadoni Bros.; Woodworth & Co., Inc.; Rainer Pools, Ltd.; James F. Bacon Roofing; Lakewood Painting & Decorating; H & R Drywall.

EMPLOYEES OF HUBER & ANTILLA CONSTRUCTION & NON UNION SUPPLIERS & DELIVERY MEN SHALL NOT USE THIS GATE UNDER ANY CIRCUMSTANCES.

On July 24, 1974, Huber and Antilla filed an unfair labor practice charge with the National Labor Relations Board alleging that the Union was picketing the east gate in violation of the National Labor Relations Act, § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1981).

On August 27, 1974, the Union and Huber and Antilla entered into a settlement agreement. As a result of this agreement, a notice was posted. The notice provided in pertinent part:

### NOTICE TO MEMBERS

WE WILL NOT engage in a strike, or induce, or encourage individuals employed by Tacoma Plumbing and Heating, Inc., or any other person engaged in commerce, or, in an industry affecting commerce, to engage in a strike, or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, material, articles or commodities or to perform any services: nor WILL WE threaten, coerce, or restrain the above-named Employer, or any other person, where an object thereof is to force or require Tacoma Plumbing and Heating, Inc. to cease doing business with Huber & Antilla Construction Co.

CARPENTERS LOCAL 470, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO

On November 21, 1974, Huber and Antilla filed a second unfair labor practice charge with the NLRB alleging that the Union was engaging in unlawful picketing in violation of section 8(b)(4)(B) of the Act. This charge was later withdrawn by Huber.

The Union ceased all picketing on December 24, 1974.

Mr. Antilla testified that the Union stationed pickets at the nonunion gate "but almost every time material men and/or union subcontractors came to the reserve gate, one of the pickets would find his way down to the reserve gate and either picket it, or stop and talk to the men to attempt to get them not to go through the gate."

On several occasions drivers from the Scofield Material Company refused to deliver concrete because of the presence of pickets at the reserve gate. Employees of several subcontractors who had union contracts also refused to enter the reserve gate because of the picketing there.

On the first occasion that a Scofield Material Company driver refused to make a delivery, Mr. Antilla spoke to him "to attempt to encourage him to cross the picket . . . ." Mr. Antilla testified that the picketing was not continuous on the reserve gate. The picket at the nonunion gate, however, would come to the reserve gate "every time a union subcontractor or material supplier came to the job."

The Union made a motion to dismiss when Huber and Antilla rested at the close of its case in chief. The Union argued to the district court that, as a matter of law, the notice given to the Union concerning the establishment of a reserve gate where picketing would be unlawful was defective; also, the signs improperly advised Huber's suppliers and deliverymen who had collective bargaining agreements with the Union to use the reserve gate.

The district court denied the motion stating that "they knew they weren't supposed to picket that gate . . ." when union suppliers and subcontractors appeared.

*THE EVIDENCE PRESENTED BY THE UNION*

John H. Meier, an official of the Roofers Union, testified that at least once a week between July and October of 1974, he observed materials delivered to the construction project on Power Line Road, at a point away from the reserve gate and the nonunion gate.

On cross-examination, Mr. Meier identified the gate located at the east end of Foster Street as the entrance posted for the employees of Huber and Antilla.[1] He stated that this gate was never used because a large ditch blocked access to it. Mr. Meier could not recall seeing a picket at the Huber and Antilla employees' gate. He had observed the picket walk the entire length of the road.

The court accepted a stipulation that, consistent with existing policy, the Teamsters Union honored all picket lines at the construction project.

Mr. Ray Fithem was the business representative of the Union in 1974. On July 14, 1974, he ordered the placement of an informational picket at the construction site. No more than two pickets were present at any time. Mr. Fithem testified that most of the materials were delivered on Power Line Road, where another picket was placed.

Mr. Antilla used both gates to go to and from the construction project. Huber employees seldom used the nonunion gate. Instead, they parked on Power Line Road and walked to their jobs without using the gates.

Scofield Material Company trucks carrying concrete went through the gate "solely reserved for subcontractors."

On cross-examination, Mr. Fithem testified that the Huber and Antilla gate was

---

1. The district court accepted the testimony presented by Huber and Antilla that the east gate was the one reserved for union suppliers, material men and subcontractors.

near the construction shack on Foster Street next to Stinson Avenue.

Mr. Fithem stated that he was aware that he was not supposed to picket the reserve gate.

The district court found *inter alia* that "[t]he appearance of George Scofield Co., a union concrete delivery and pouring company, through said Union Reserve Gate was not improper and further, if such entrances were improper they were so nominal as to not violate the dignity of the reserve gate system."

In its conclusions of law, the district court stated: "The Union Reserve Gate was properly established and maintained in all respects by Plaintiffs herein, with clear notice to all of its function and location."

### DISPOSITIVE ISSUE ON APPEAL

The Union contends that the notice it received and the signs that were posted were legally insufficient to create a reserve gate where picketing would be unlawful. We agree.

### DISCUSSION

The district court concluded that the picketing at the reserve gate constituted a secondary boycott in that the Union's intent was to appeal to employees of neutral employers.

■ It is an unfair labor practice under the National Labor Relations Act, § 8(b)(4), 29 U.S.C. § 158(b)(4) (1981) [hereinafter cited as Act] to engage in, or to induce or encourage a strike or a boycott if the purpose of such action is to force any employer or self-employed person to cease using, selling, handling, transporting or dealing in the products of another, or to cease doing business with any other person. *See* H.R.Rep. No. 510, 80th Cong., 1st Sess. 43 (1947). One of the purposes of section 8(b)(4) of the Act is to shield "unoffending employers . . . from pressures in controversies not their own." *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

■ Thus, if the picketing is directed solely at the employer with whom a union has a bona fide labor dispute, "it may be lawful even though some neutral or secondary employers might be affected. Conversely, if its object is to bring indirect pressure on the primary employer by involving neutral or secondary employers and their employees, then it may be unlawful." *NLRB v. Northern California District Council of Hod Carriers and Common Laborers*, 389 F.2d 721, 725 (9th Cir. 1968).

The Supreme Court has succinctly summarized the perplexing concept of secondary boycott:

"[p]icketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer." *Electrical, Radio & Machine Workers v. NLRB*, 366 U.S. 667, 673–74, 81 S.Ct. 1285, 1289–1290, 6 L.Ed.2d 592 (1961).

■ Special problems concerning the application of the ban against secondary boycotts are presented where picketing occurs in common situs cases, *i. e.*, where several employers are engaged in independent tasks on the same premises. Under such circumstances the common site is the only place where picketing can occur when a union has a grievance against one of the employers. When the picketing occurs at the premises of the struck employer, the union has a duty to "exercise its right to picket with restraint consistent with the right of neutral employers to remain uninvolved in the dispute." *Retail Fruit & Vegetable Clerks, Local 1017 v. National Labor Relations Board*, 249 F.2d 591, 599 (9th Cir. 1957).

■ In common situs cases, a primary employer involved in a strike may set up separate gates to insulate other employers not involved in the labor dispute from the picketing. If such a reserve gate is properly established, the union is required to restrict its picketing to those gates used by the primary employer and his suppliers, deliverymen, and materialmen. *United Steelworkers v. Workers of America v. NLRB*,

376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964). If the evidence shows that the reserve gate is used by employees of suppliers, materialmen, and deliverymen of the primary employer, the union is not barred from picketing such mixed use. *Linbeck Construction Corp. v. NLRB,* 550 F.2d 311, 317 (5th Cir. 1977).

 In the matter before us it is clear that Huber and Antilla intended to set up a reserve gate system to restrict picketing by the union. Unfortunately, Huber and Antilla tried to set up separate gates based on whether the neutral subcontractors and Huber and Antilla's suppliers and materialmen were signatories to a collective bargaining agreement with an appropriate union. As posted by Huber and Antilla the signs failed to indicate that deliveries to the primary employer were restricted to the gate where picketing would be lawful. *See, Lawhon Construction Co. v. Carpet, Linoleum & Resilient Floor Decorators, Local 1179,* 394 F.Supp. 520, 523 (1974). Instead, the signs on the two gates when construed together directed Huber and Antilla's Union deliverymen and suppliers to enter the neutral gate reserved for the secondary employers, and Huber and Antilla's "non-union" suppliers and deliverymen to the other gate. Huber and Antilla's attempt to restrict all picketing to the nonunion gate would have unlawfully denied the Union its right to carry its message to Huber and Antilla's materialmen and suppliers.

As noted by the Supreme Court in *United Steelworkers,* 376 U.S. at 499, 84 S.Ct. at 904:

> Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt. In light of this traditional goal of primary pressures we think Congress intended to preserve the right to picket during a strike a gate reserved for employees of neutral delivery men furnishing day-to-day service essential to the plant's regular operations.

In view of the improper directions on the signs advising deliverymen that they could enter the reserve gate if their employers had a union contract, the Union did not violate § 8(b)(4)(A) of the Act by picketing at both gates. The Union had no reasonable alternative if it wished to preserve its right to picket those gates used by materialmen and suppliers. The fact that employees of one Union supplier (Scofield) refused to cross the picket line did not make unlawful the picketing which occurred thereafter. The Union had a right to continue to picket the "reserve" gate so long as the sign invited Huber's suppliers to enter there.

The judgment is REVERSED.

The District Court is directed to enter judgment in favor of the Union.