742 F.2d 498
 117 L.R.R.M. (BNA) 2284, 101 Lab.Cas. P 11,176
 LOCAL UNION NO. 76 of the INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO, Petitioner/Cross-respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-petitioner.
 Nos. 83-7866, 83-7929.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1984.
Decided Sept. 5, 1984.
 
 F.G. Enslow, Judson F. Miller, Griffin & Enslow, Tacoma, Wash., for petitioner/cross-respondent.
 Daniel R. Pollitt, Elliott Moore, Washington, D.C., for respondent/cross-petitioner.
 On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board.
 Before PECK,* WRIGHT, and FARRIS, Circuit Judges.
 Eugene A. WRIGHT, Circuit Judge:
 
 
 1
 An unfair labor practice charge was brought by Gaylord Broadcasting Co., d/b/a KSTW-TV, against Local Union No. 76, International Brotherhood of Electrical Workers. It charged that the Union violated Sec. 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(b)(4)(i), (ii)(B), by engaging in unlawful secondary picketing at a gate reserved exclusively for a neutral contractor.
 
 
 2
 During a strike against KSTW by the Union, KSTW established a separate gate for the sole use of a neutral employer who was making capital improvements on KSTW property. The issues here are whether a particular incident of alleged misuse tainted the gate and if so whether its neutrality was rehabilitated.
 
 FACTS
 
 3
 On November 2, 1982, some KSTW employees went out on strike and began to picket KSTW's Tacoma facility. Gordon Korsmo Construction Company was then building a structural addition to the KSTW facility. No KSTW employees were involved in the construction which caused no interruption in KSTW's day-to-day operations. When picketing began, construction stopped.
 
 
 4
 KSTW immediately attempted to set up a neutral gate for the sole use of Korsmo Construction. It posted signs reserving its Trafton Street entrance for the exclusive use of the employees, agents, visitors, and suppliers of Korsmo Construction and its subcontractors, and its 19th Street entrance for the exclusive use of the employees, agents, visitors, and suppliers of KSTW. This effort was unsuccessful.
 
 
 5
 About November 17, KSTW erected a chain link fence around part of its building with a locking gate at the Trafton Street entrance, attended by a 24-hour security guard. The guards were given a list of neutrals allowed to use that gate and were instructed to let no others enter.
 
 
 6
 KSTW notified the Union by letter on November 18 that the Trafton neutral gate had been reestablished and explained the steps taken to maintain the integrity of the gate. It requested the removal of pickets from the neutral gate.
 
 
 7
 Picketing at the Trafton entrance continued until December 3, when the parties reached a settlement agreement. Under the agreement unfair labor practice charges against the Union were dismissed and it agreed not to picket the Trafton entrance as long as it was used exclusively by the designated neutrals.
 
 
 8
 The Union claimed that the neutral status of the Trafton entrance was destroyed when a garbage truck serviced a KSTW dumpster on February 24, 1983. The Union resumed picketing at the Trafton gate on February 25 and construction work stopped.
 
 
 9
 On February 25 KSTW heard of the dumpster incident, asked that the guard who permitted the use be removed from further service at KSTW, and reaffirmed its instructions to the security service. On that day it notified the Union by letter that the Trafton gate was still reserved as a neutral gate and that the dumpster incident did not justify picketing.
 
 
 10
 Picketing at the Trafton gate continued until April 19, when it was enjoined by this court's order. Construction work resumed about May 1. KSTW paid Korsmo an additional $58,000 on account of the delay.
 
 
 11
 An Administrative Law Judge concluded that the Union was guilty of unlawful secondary picketing at a neutral gate, in violation of Sec. 8(b)(4)(i), (ii)(B) of the NLRA. The Board affirmed that decision.
 
 ANALYSIS
 I. Legal Background
 
 12
 The NLRA, Sec. 8(b)(4), was designed to meet the dual Congressional objectives of preserving the right of unions to pressure offending employers in primary labor disputes while shielding unoffending employers from pressures generated by the controversies of others. NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). It prohibits a union from picketing with the object of inducing a neutral employer to cease doing business with the primary employer with whom the union has a dispute. 29 U.S.C. Sec. 158(b)(4).[1]
 
 
 13
 However, that prohibition does not apply to otherwise lawful primary picketing. Id. Sec. 158(b)(4)(ii)(B). Activity directed only at the primary employer may be lawful even if some neutral employers may be affected. NLRB v. Northern California District Council of Hod Carriers, 389 F.2d 721, 725 (9th Cir.1968).
 
 
 14
 Although the distinction between legitimate primary activity and unlawful secondary activity is important, it is not marked by a bright line. Local 761, International Union of Electrical Workers v. NLRB, 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961) (General Electric ). The problem is complicated when two employers perform separate tasks at a common situs. The criteria devised by the courts to draw the distinction rely heavily on the means used by the union to promote its cause. Id. at 674, 81 S.Ct. at 1290.
 
 
 15
 The Moore Dry Dock case established standards for valid primary picketing when the situs of the primary employer is ambulatory. Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950).
 
 
 16
 The NLRB there laid out four indicia of valid primary picketing: (1) it is limited to times when the situs of the dispute is on the premises, (2) the primary employer is engaged in its normal business at the site, (3) the picketing is reasonably close to the situs, and (4) the picketing clearly discloses that the dispute is with the primary employer only. The NLRB then began to apply those standards to cases in which the situs was owned by the primary employer. See, e.g., Retail Fruit & Vegetable Clerks (Crystal Place Market), 116 N.L.R.B. 856 (1956), enforced, 249 F.2d 591 (9th Cir.1957).
 
 
 17
 The Supreme Court has approved the Board's balancing of the interests of unions and neutral employers and applying the statute to make it unlawful to picket at a gate used exclusively by employees of neutral contractors who work on the struck employer's premises. General Electric, 366 U.S. at 680-81, 81 S.Ct. at 1293-94. The key to the union's right to picket at a particular gate is the type of work performed by those using it. Id.
 
 
 18
 In applying Sec. 8(b)(4) and the Moore Dry Dock standards to a situation involving a reserved gate on the premises of a primary employer, these are the controlling considerations:
 
 
 19
 'There must be a separate gate marked and set apart from other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations.'
 
 
 20
 Id. 366 U.S. at 681, 81 S.Ct. at 1293-94 (quoting United Steelworkers v. NLRB, 289 F.2d 591, 595 (2d Cir.1961)). If there is substantial mixed use of a gate, picketing is not barred. Id. at 682, 81 S.Ct. at 1294; Huber & Antilla Construction v. Carpenters Local 470, 659 F.2d 1013 (9th Cir.1981), cert. denied, 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982). When a reserved gate system breaks down, however, an employer may effectively reestablish it if the revised system is honored and the union involved is notified. Carpenters Local 470 (Mueller-Anderson, Inc.), 224 N.L.R.B. 315, 316 (1976), enforced, 564 F.2d 1360, 1363 (9th Cir.1977).
 
 
 21
 If the Board has applied the proper legal standards, we will affirm its findings if supported by substantial evidence in the record as a whole. Carpenters Local 470 v. NLRB, 564 F.2d 1360, 1362-63 (9th Cir.1977).
 
 II. The Dumpster Incident
 
 22
 The KSTW property had only one trash dumpster, which was used by KSTW and Korsmo Construction. Upon request, the city sent a truck to remove the dumpster and return with an empty one. The dumpster removal truck used the 19th Street entrance until February 24, 1983, when the truck brought an empty dumpster in through the Trafton entrance. The truck was not on the list of those permitted through the neutral gate, but the guard allowed it to enter when the driver said that "the union" had told him to use that gate. The guard assumed that the driver referred to the construction union.
 
 
 23
 The NLRB suggests that because the truck was returning a dumpster used by both KSTW and Korsmo Construction, the truck's use of the neutral gate was not even an isolated breach of its neutrality. The argument lacks merit.
 
 
 24
 A primary strike, which is protected by the statute, is aimed at halting the regular operations of the primary employer. United Steelworkers v. NLRB, 376 U.S. 492, 498, 84 S.Ct. 899, 903, 11 L.Ed.2d 863 (1964). Congress preserved the right to picket a gate reserved for neutrals furnishing services essential to the primary employer's regular operations. Id.
 
 
 25
 In General Electric the Supreme Court held that if a reserved gate was used by employees of independent contractors who performed maintenance tasks necessary to the normal operations of General Electric, the use of the gate was mixed and outside the bar of Sec. 8(b)(4). General Electric, 366 U.S. at 682, 81 S.Ct. at 1294. The dumpster truck provided an essential service to KSTW. That it serviced Korsmo Construction as well does not save the gate from taint.
 
 III. The Continuing Neutrality of the Gate
 
 26
 The crucial issue is whether the taint of the February 24 dumpster incident irrevocably destroyed the neutrality of the Trafton entrance.
 
 
 27
 The use of a neutral gate by those performing normal operations for the primary employer may be so insubstantial that it will be de minimis. General Electric, 366 U.S. at 682, 81 S.Ct. at 1294. The dumpster incident was insubstantial. It was the result of a security guard's disregard of explicit instructions and was unlikely to be repeated. The guard involved was removed and the instructions reaffirmed. Under the circumstances, the dumpster incident in isolation was insignificant.
 
 
 28
 The Union argues that the dumpster incident was significant because the neutral gate had been contaminated and rehabilitated many times previously. For that reason, it argues, the dumpster incident finally destroyed the neutrality of the gate and made reestablishment of neutrality impossible.
 
 
 29
 The focus of our inquiry is the object of the Union's challenged picketing. International Ass'n of Bridge Workers, Local No. 433 v. NLRB, 598 F.2d 1154, 1157 (9th Cir.1979). Numerous violations of a neutral gate may remove its protection from picketing, based on a union's right to direct pickets to primary employers' suppliers and employees. See id.
 
 
 30
 However, the Union has a duty to picket with restraint, to minimize its impact on neutral employers and employees. Allied Concrete, Inc. v. NLRB, 607 F.2d 827, 830-31 (9th Cir.1979). If an established reserved gate system provides a reasonable alternative for effective communication with the primary employer and its employees, that system must be respected. Id.
 
 
 31
 Although there were violations of the reserved gate system before the fence was erected in November 1982, the Union presented no evidence of specific violations between November 18 and February 23. The only evidence of any during that period was one striker's testimony that he had seen or heard of "13 or 14 separate things that we thought could be violations or might be." Transcript at 95-96. No violations were reported to KSTW. Id.
 
 
 32
 After the fence was erected, KSTW effectively established a neutral gate and took reasonable precautions to maintain its neutrality. The dumpster incident occurred without fault of KSTW and was followed by immediate corrective action. Picketing at the Trafton entrance was not necessary to communicate effectively with KSTW or its employees. The Union's unlawful secondary object seems clear. The Board's finding of an unfair labor practice was supported by substantial evidence.
 
 
 33
 Its order is enforced.
 
 
 
 *
 Senior Circuit Judge John W. Peck, United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 Section 8(b) of the NLRA provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents--
 ....
 (4)(i) to engage in, or to induce or encourage any [employee] ... to engage in, a strike or refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, ... or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is--
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ...: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 ....
 29 U.S.C. Sec. 158(b)(4).