**Robert H. MILLER, Regional Director of Region 20 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS UNION, LOCAL 2, HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION, AFL–CIO, Respondent.**

**No. C–84–6382 TEH.**

United States District Court, N.D. California.

Jan. 3, 1985.

Walter L. Kintz, Alan D. Longman, Joseph P. Norelli, N.L.R.B., Region 20, San Francisco, Cal., for petitioner.

Matthew D. Ross, Neyhart, Anderson, Nussbaum, Reilly & Freitas, San Francisco, Cal., for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THELTON E. HENDERSON, District Judge.

This case came to be heard upon the verified Petition of Robert H. Miller, Regional Director of Region 20 of the National Labor Relations Board, herein called "Petitioner" or "Board". The Board's Petition, supported by affidavits and exhibits, seeks an injunction abating alleged unfair labor practices, pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.*, herein called the "Act", pending final disposition of the Board's unfair labor practice com-

plaint. The underlying unfair labor practice complaint alleges that the Respondent in this case, Hotel and Restaurant Employees and Bartenders Union, Local 2, Hotel Employees and Restaurant Employees International Union, AFL–CIO, herein called "Respondent", "the Union" or "Local 2", engaged in unfair labor practices in violation of Section 8(b)(4)(i)(ii)(B) of the Act, in the course of picketing at or near the business location of the charging party, Scoma's Restaurant Inc., herein referred to as "Scoma's" or the "charging party". In opposition to the Board's Petition for a Section 10(*l*) injunction, Respondent filed a memorandum of points and authorities supported by counter-affidavits and exhibits.

The Court, having heard oral argument in this matter on October 15, 1984,* and having fully considered the papers, affidavits, and the entire record in this case, finds that the Board has failed to establish reasonable cause to believe that Respondent has violated Section 8(b)(4)(i)(ii)(B) of the Act, and therefore DENIES the petition for an injunction under Section 10(*l*) based on the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. BACKGROUND

The last collective bargaining agreement between Local 2 and Scoma's expired August 31, 1984.[1] Thereafter, Local 2 and Scoma's were unable to agree upon the terms of a new collective bargaining agreement and the Union began picketing at or near Scoma's on September 1 in furtherance of its contract demands.[2]

Scoma's is located in the Fisherman's Wharf area of San Francisco. A reduced section of the site plan from the San Francisco Port Authority, Department of Engineering, supplied by Petitioner (see Initial Affidavits at 1) and incorporated in this Order, Findings of Fact and Conclusions of Law, shows that Scoma's Restaurant is accessed by way of Pier 47, commonly known as Jones Alley. [See Appendix.] The alley, which leads north off of Jefferson Street, a main east-west avenue in the Fisherman's Wharf area, is approximately 30 feet wide,[3] and is shown on the reproduced site plan as Wharf J6. Scoma's Restaurant is located at the north end of the Alley, approximately 400 feet from the intersection of Jones Alley and Jefferson Street.[4] The customer and service entrances to Scoma's are located along the North side of Scoma's building facing the wharf area identified in the site plan as Wharf J7. This area is not visible from the intersection of Jefferson and Jones Alley. The Wharf ends and the San Francisco Bay begins north of Wharf J7.

Scoma's maintains a large sign on a utility pole located at the southeast corner of Capurro's building, adjacent to the entrance to Jones Alley, in view of pedestrians and motor vehicles passing through Jefferson Street.[5] The sign reads:

OPEN

LUNCH    DINNER

SCOMA'S

From on or about the third day of the strike, Scoma's also operated a shuttle ser-

---

* The Court exercised its discretion under section 10(*l*) to allow the charging party (Scoma's), by its counsel, to address the Court as well.

**1.** All dates referred to herein are to 1984 unless otherwise indicated.

**2.** Respondent's Declarations, page 12; Petitioner's Initial Affidavits, pages 22, 35. The Board produced three sets of affidavits and exhibits in support of its Application for an Injunction. Each set is consecutively paginated. Reference herein to the Petitioner's evidence shall be as follows: Petitioner's Initial Affidavits and Exhibits filed September 27th: "Petitioner's Initial Affidavits"; Petitioner's Supplemental Affidavits

and Exhibits filed October 2: "Petitioner's Affidavits"; Petitioner's Rebuttal Affidavits and Exhibits, filed October 19th: "Petitioner's Rebuttal Affidavits."

**3.** Petitioner's Initial Affidavits, page 22.

**4.** *Id.*

**5.** A photograph of the sign is attached to the Declaration of Keffer, Respondent's Declarations, page 37. See also photograph "PP", taken by a Scoma's agent, appearing at Respondent's Declarations, p. 61; also Respondent's Declarations, p. 13.

vice to transport customers and employees between Scoma's Restaurant and the entrance of Jones Alley on Jefferson Street and/or a point a block or two beyond.[6]

Several other businesses operate on Jones Alley. Castignola's Restaurant is located on the northeast corner of Jefferson Street and Jones Alley, with its main entrance on Jefferson Street. Capurro's Restaurant is located on the northwest corner on Jefferson Street and Jones Alley; its main entrance is also on Jefferson Street.[7] The Crab Boat Onwers' Association is located on the west side of Jones Alley, about 80 feet north of Jefferson Street. United Shell Fish Company is located on both the east and west sides of Jones Alley, about 150 to 200 feet north of Jefferson Street. Fisherman's Wharf Seafood Company is located at the end of Wharves J7 and J8, about 450 feet to the northwest of the entrances to Scoma's. California Shellfish Co. is located at the end of Wharf J9. Captain Phil, Butchie "B", Uncle Ray, New Holiday III and Ketchikan are charter fishing boats berthed along the east side of Wharf J6, from about 240 feet to about 360 feet north of Jefferson Street. Lucky Lady and Miss Jody are charter fishing boats berthed along Wharf J8, to the northwest of Scoma's.[8] Respondent does not have a labor dispute with any of the above-mentioned entities.[9]

While there is some dispute about the precise location and number of pickets used by Respondent, it is undisputed that, since the picketing began, Respondent has placed pickets at the following locations: at the two customer entrances to Scoma's, in the area in front of Scoma's and in front of Scoma's Fish Receiving facility; at the Jefferson Street entrance to Pier 47; and at various points along the far east and west sides of Pier 47 and Jones Alley, between Scoma's and Jefferson Street.[10] At all times the picketers carried signs indicating that Respondent was on strike at Scoma's.[11]

On September 10, 1984, Scoma's filed a charge with the Board in Case No. 20–CC–2792, alleging that Local 2 was engaging in unfair labor practices in violation of Section 8(b)(4)(i)(ii)(B) of the Act. In a September 13th letter to Scoma's, the Regional Director initially refused to issue a complaint on the grounds that the picketing was at a location identified as an entrance to Scoma's and used to transport employees/patrons intermittently, that the picketing was complying with the terms of a temporary restraining order issued September 7, 1984 (see n. 10), and that the picketing had only

---

6. There is conflicting evidence as to the frequency of shuttles, whether one or two automobiles were used for this purpose, and the exact drop off point. See Respondent's Declarations, pages 40–44; Initial Affidavits, pages 81–82). For the purposes of this petition, the Court looked at the conflicting evidence in the light most favorable to petition.

7. Initial Affidavits, page 41.

8. Initial Affidavits, pages 1, 22, 35–36, 39, 58.

9. Initial Affidavits, pages 35, 49.

10. At the end of the first week of picketing, on September 6, Scoma's sought and obtained a Temporary Restraining Order issued by a Judge of the Superior Court of the City and County of San Francisco, limiting the location and conduct of Union pickets in Jones Alley and in the area north of or "in front of" Scoma's. Under the Temporary Restraining Order, the Union was allowed two pickets at the entrance to Jones Alley on Jefferson Street. Additional pickets were allowed within five feet of the buildings on the west side of Jones Alley, between the north side of the Capurro's Restaurant to the south side of the first pier intersecting the west side of Pier 47, shown on the site plan as Wharf J9. Additional pickets were authorized on both sides of Jones Alley near the area identified as Wharf J6 between Wharf J9 and Scoma's. The Union was permitted additional pickets in the area in front of or north of Scoma's. See Initial Affidavits, pages 13–15. The areas authorized for picketing by the State Court Temporary Restraining Order are shown on the attached site plan. The Superior Court proceedings did not involve any unfair labor practice issue under the Act, and petitioner was not a party to the proceedings.

11. Initial Affidavits, pages 45, 85.

a *de minimus* effect on neutral employers.[12]

The Board subsequently issued a complaint in response to the September 10th charge on September 25.[13] On September 27th, the Board filed the instant Petition pursuant to § 10(*l*) of the Act to enjoin the Union from picketing at the head of and along Jones Alley. The petition essentially alleges that the Board has reasonable cause to believe that the Union, by picketing at these points, has an illegal objective of 1) forcing or requiring United Shell Fish Co., Fisherman's Wharf Seafood Co. and others engaged in commerce to cease doing business with Scoma's, 2) forcing or requiring Sorenson Trucking, Mid-Coast Trucking, Petrini's Market, Paoli's Fish Market, Canton Fish Market, Tamaras Supply Co. and others engaged in commerce to cease doing business with the neutral businesses on Jones Alley, and 3) forcing or requiring a cessation of business between the neutral businesses on Jones Alley and others engaged in commerce.[14]

## B. EVIDENCE OF RESPONDENT'S CONDUCT TOWARD NEUTRAL BUSINESSES & REVENUE LOSS BY NEUTRALS

Although the Board primarily relies on the *mere location* of the picketing to establish reasonable cause to believe that the Union has an unlawful objective of enmeshing neutral employers in its labor dispute with Scoma's it also submitted numerous affidavits concerning the Union's conduct toward neutrals and revenue loss by neutral businesses in an attempt to buttress the reasonableness of inferring such an objective from the mere location of the pickets. In fact, the Board explains in its Reply Brief, that such evidence was what, in part, prompted it to issue a complaint after it had initially declined to do so, although the location of the picketing had not changed. The Court agrees that evidence of Union interference with neutrals (or the absence thereof) is relevant to determining whether there is reasonable cause to believe that it has an unlawful objective based on the location of the pickets. Therefore, the Court makes the following findings regarding the affidavits submitted which bear on Respondent's conduct toward neutral businesses and the strike's effect on the revenues of neutral businesses.

### 1. *Capurro's Restaurant*

There is no evidence in the record that Respondent has intended to interfere with this neutral business. Although, in a September 14th declaration, Paul Capurro, owner of Capurro's restaurant, stated that Respondent generally told people not to go down the pier [15] and that his business was off 25–50% as a result of the strike,[16] he subsequently contradicted the first statement,[17] and was forced to recant on the second when the Board eventually asked for documentation of the financial loss.[18] Capurro also complained that strikers carrying signs as they passed in front of

---

**12.** *See* Respondent's Declarations, page 87 (Exhibit A).

**13.** The Board contends that affidavits submitted after September 13th prompted it, in part, to reevaluate the evidence and subsequently issue a complaint. Reply Brief at 3–7.

**14.** Petition, pages 3–4.

**15.** Initial Affidavits, page 43, lines 3–12.

**16.** Initial Affidavits, page 44, lines 21–24. *See also,* Initial Affidavits, page 42, lines 3–8.

**17.** Mr. Capurro contradicted himself on this point in his October 9, 1984 Affidavit when he stated "I have *not* heard the pickets tell people

not to go down Pier 47. . . . I have heard the pickets tell people not to go *to Scoma's Restaurant* and that the food at Scoma's is not good." (Emphasis supplied) (Rebuttal Affidavits, p. 9, lines 1–5). The Board expressly disavowed reliance on the earlier affidavit.

**18.** See Rebuttal Affidavits, pages 10–25. According to Capurro's October 11th declaration, Capurro's gross receipts for July, August and September of 1983 were $76,440.78, $62,163.56 and $47,729.61, respectively. Capurro's gross receipts for the same months in 1984 were $73,050.15 (July), $68,911.00 (August), and $46,799.69 in gross receipts for September 1984 during Local 2's strike. The Board again, disavowed any reliance on Capurro's earlier statement.

his business on their way to converse with strikers at a nearby struck restaurant adversely affected his business.[19] However, subsequent affidavits indicate that this is no longer a problem.[20]

In addition, the Court also finds that Local 2 took affirmative steps to minimize any inconvenience or harm to Capurro's business by (1) posting a sign on September 20th stating that "Local 2 Has No Dispute With Capurro's,"[21] (2) sending a telegram to Capurro promising cooperation[22], and (3) meeting with Capurro in order to discuss possible measures to minimize any inconvenience to Capurro's Restaurant.[23] Mr. Capurro confirmed the meeting with the Union representative but still asserted the Union's offer of cooperation had little effect.[24] In the same affidavit, however, Capurro conceded that the pickets had made an effort to lower their picket signs when walking in front of his business, on their way to or from Pompei's Grotto.[25] In addition, Local 2 members have referred potential customers to Capurro's. All of the above is inconsistent with an alleged objective of enmeshing neutrals on the pier.[26]

### 2. United Shell Fish Company

The Board's Initial Affidavits include three affidavits from Joseph Svedise, owner of the United Shell Fish, alleging that since the Union's picketing, his revenues dropped 15% and that customers and suppliers were reluctant to use Jones Alley to deliver or pick up products, and that certain suppliers were making deliveries a block or two from Jones Alley.[27] The Court notes that the stated revenue loss is not documented in the record and finds that his statements concerning deliveries/pick ups are not reasonably supported by the record, as is discussed below:

### a) Paoli's Meat Market

Mr. Svedise alleges that Paoli's Fish Market stopped picking up fish products from United Shell Fish during the strike because of harassment from pickets.[28] Mr. Paoli, however, was quite clear that "[the] pickets have not interfered with my picking up products from United Shell Fish Company." Mr. Paoli, whose statement was taken by a Board agent on September 24th, stated that he asked United Shell Fish to deliver to him the week of September 16 only because he was short two employees, but that "prior to [that] week I went daily to pick up fresh sea products from United Shell Fish Company."

### b) Canton Fish Market and Petrini's

Mr. Svedise also alleges that Canton Fish Market and Petrini's refused to make pickups from United Shell Fish for two days because of picketing, yet he admits that after he told the pickets that Canton Fish market was a customer of United Shell Fish the pickets made no effort to interfere with Canton Fish Market's use of Jones Alley.[29] The manager of Canton Fish states that his company picks up fish products at United Shell Fish daily and that Canton Fish drivers were "stopped", early in the strike twice, but were "let pass with no trouble" when they indicated they had business with United Shell Fish.[30]

---

19. Initial Affidavits, pp. 40–45.

20. *See* Rebuttal Affidavits, p. 8, lines 14–19.

21. Respondent's Declarations, p. 22, photograph 1 and 2 at page 23. Capurro states he took down the sign because its message was on a strike sign. Rebuttal Affidavits, p. 7.

22. Respondent's Declarations, p. 28.

23. Respondent's Declarations, pp. 27–30.

24. Rebuttal Affidavits, p. 7.

25. Rebuttal Affidavits, p. 8, lines 14–19.

26. Respondent's Declarations, p. 39 (Helin); Supplemental Affidavits, p. 95 (Gribbon); and p. 96 (Toporovich).

27. Initial Affidavits, pp. 25–32.

28. Initial Affidavits, p. 26.

29. Initial Affidavits, p. 26.

30. Respondent's Declarations, p. 1.

Petrini's buyer, Alfredo Caturegli, also states that Petrini's changed its operations and began having United Shell Fish deliver supplies to Petrini's more than two months *before* the strike for pure business reasons.[31]

### c) *Sorenson Trucking*

Mr. Svedise also states that the driver for Sorenson Trucking refused to make deliveries at United Shell Fish's premises during the strike and has instead unloaded products outside Jones Alley on Jefferson Street.[32] When the Union became aware of the Sorenson driver's reluctance to enter Jones Alley, the Union immediately took affirmative measures to remedy the situation. Specifically, the Union sent a mailgram, and then made follow-up telephone calls, clarifying that it had no dispute with United Shell Fish and requesting that Sorenson "complete pickup and deliveries in the usual and customary fashion.[33]

### d) *Tamaras Trucking*

The most specific allegation made by Mr. Svedise concerns an incident where he claims to have observed a picket approach a Tamaras Supply Company vehicle with a picket sign. Svedise admits that after the Tamaras driver asked him if United Shell Fish was on strike and he said "no", the delivery was made.[34] The Union was able to locate the Tamaras driver and he stated under oath that not only did he make the delivery, but that he never perceived an attempt by Local 2 pickets to persuade or prevent him from delivering products to United Shell Fish.[35] Both the driver and another Tamaras declarant, the Tamaras

warehouse supervisor, confirm that Local 2 called and sent telegrams to Tamaras stating that the Union's disputes was limited to Scoma's and requested that Tamaras deliver to United Shell Fish in the usual and customary manner.[36]

### e) *McCalls Trucking and The Brown Line, Inc.*

In an October 10th rebuttal affidavit, Svedise claims that drivers for McCalls Trucking and The Brown Line, Inc. were refusing to use Jones Alley, forcing United Shell Fish employees to pick up fish products or salt from these two suppliers in front of Capurro's or at other areas on Jefferson Street.[37] This latter affidavit, however, does not allege that the Union attempted in any way to discourage either vendor from using Jones Alley. Furthermore, affidavits and exhibits by Respondent indicate that it contacted McCalls and Mid-Coast Trucking to assure them that it had no dispute with United Shell Fish and requested that deliveries be made as usual.[38]

### f) *Aark Seafood Company*

Svedise, in his Oct. 10 affidavit, and F. Kinley, owner of Aark Seafood Company, state that while Kinley was delivering scallops to United Shell Fish Company on October 3rd, pickets yelled at him not to go down the pier and that one picket jumped on his truck. Kinley told the picket to get off the truck and proceeded to make his delivery.[39] The Union subsequently sent a telegram apologizing for the incident and requesting that deliveries be made as usual.[40]

31. Supplemental Affidavits, p. 104.

32. Initial Affidavits, p. 26.

33. Respondent's Declarations, p. 4.

34. Initial Affidavits, p. 27.

35. Respondent's Declarations, p. 2.

36. Respondent's Declarations, p. 3.

37. Rebuttal Affidavits, pp. 3–4.

38. Declaration of Keffer, Oct. 15, pp. 2–4.

39. Rebuttal Affidavits, pp. 1, 3.

40. Declaration of Keffer, Oct. 15, and attached exhibits.

### 3. *Other Businesses*

The remaining neutral businesses on the Pier (Fisherman's Wharf Seafood,[41] California Shellfish Company, various charter boats, including Captain Phil, Butchie "B", uncle Ray, New Holiday III, Ketchikan,[42] Lucky Lady and Miss Jody, and Castagnola's Restaurant[43]) can be summarily dealt with by stating that there is no evidence that respondent has interfered with traffic to or from their businesses or caused revenues to fall. The Court also finds that, at least as of September 20th, Respondent posted a sign at the entrance to Jones Alley reading "Scoma's on Strike. Local 2 has no dispute with any other business or charter of commercial fisherman on Pier 47."[44]

Any Finding of Fact herein deemed to be a Conclusion of Law shall be considered a Conclusion of Law.

**41.** *See* Supplemental Affidavits at 70–71. (Balestrieri, Owner of Fisherman's Wharf Seafood, stating that "the picketing has not affected any of my deliveries or pick ups by FWS' customers. At most the pickets have been a nuisance to myself and my employees. We have been stopped at the entrance to Pier 47 by the pickets. I was stopped twice. I was, and my drivers, also, were, allowed to continue about our business when the picket learned of our business. Other than this the picketing has not affected my business.")

**42.** One of the Supplemental Affidavits filed on October 2 alleges Union efforts to involve a private charter fishing boat in Local 2's dispute with Scoma's, e.g., the declaration of Barry Stanford (Supplemental Affidavits, p. 89). Stanford alleged that he was a deck hand of the Ketchikan and witnessed Union pickets attempt to dissuade potential customers from chartering the Ketchikan for a fishing or boating excursion. Before the issuance of the Complaint, the Board gave some weight to the Stanford affidavit (*See* Declaration of Ross, Respondent's Declarations, p. 80), but the Board does not rely on Stanford's Affidavit in this proceeding for reasons which are readily apparent from a reading of the declaration of the skipper of the Ketchikan, Jerry Hunt, who discredits Stanford and completely denies any effort by Union supporters to affect his business or even any incidental impact on the business of the Ketchikan. (Supplemental Affidavits, p. 92).

**43.** The Union also supplied declarations from employees of other companies using Jones Alley to deliver to Fisherman's Wharf Seafood Company or Castagnola's and these declarants state

### CONCLUSIONS OF LAW

Any Conclusion of Law herein deemed to be a Finding of Fact shall be considered a Finding of Fact.

■ Section 8(b)(4) of the Act was designed to meet the dual Congressional objectives of preserving the right of unions to pressure offending employers in primary labor disputes while shielding unoffending employers from pressures generated by the controversies of others. *NLRB v. Denver Building and Construction Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). To this end, the Act prohibits a union from picketing with an object of inducing a neutral employer to cease doing business with the primary employer with whom the union has a dispute or with any other person engaged in commerce. 29 U.S.C. § 158(b)(4).[45] *See Huber*

that pickets did nothing more than question the drivers about their destination and made no effort to impede deliveries. (See Declarations of Guidott (Steiner Corp.), Respondent's Declaration, page 7; Hendrie (Rathjen Liquors), Respondent's Declaration, page 8).

**44.** Respondent's Affidavits at 22–23.

**45.** Section 8(b)(4)(i)(ii), subparagraph (B) of the Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C. § 158(b)(4)(i)(ii)(B), provides, in relevant part:

Section 8(b): It shall be an unfair labor practice for the labor organization or its agents—

(4)(i) to engage in or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services: or

(ii) to threaten, coerce, or restrain any person engaged in commerce, where in either case an object thereof is:

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees.... *Provided,* that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strikes or primary picketing.

*and Antilla Construction v. Carpenters, Local 470,* 659 F.2d 1013 (9th Cir.1981) ('[I]f [the union's] object is to bring indirect pressure on the primary employer by involving neutral or secondary employers and their employees, then [the picketing] may be unlawful.')

However, the concluding provision to Section 8(b)(4)(B), stating that "nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing" has been interpreted to mean that if picketing is directed solely at the employer with whom a union has a bona fide labor dispute, it may be lawful even though some neutral or secondary employers might be affected. *Huber and Antilla Construction v. Carpenters Local 470, supra,* 659 F.2d at 1017; *NLRB v. Northern California District Council of Hod Carriers and Common Laborers,* 389 F.2d 721, 725 (9th Cir.1968).

■ Section 10(*l*) of the Act, 29 U.S.C. 160(*l*), provides that when the Board has "reasonable cause" to believe that the Union has violated § 8(b)(4)(B), and therefore an unfair labor practice complaint should issue, the Board shall petition a United States district court for injunctive relief pending the final adjudication by the Board of the unfair labor practice complaint. In *Kennedy v. Teamsters Local 542,* 443 F.2d 627, 628–29 (9th Cir.1971), the Court set forth the standard for granting preliminary injunctive relief.

All that is required under Section 10(*l*) for a regional director to petition for such an injunction is reasonable cause to believe an unfair labor practice is being committed. The preliminary injunction should be granted by the court if the court finds that the factual allegations and the propositions of law underlying the regional director's petition are not insubstantial and frivolous so that he has reasonable cause for believing the Act has been violated, and if the court finds that injunctive relief is appropriate ... *San Francisco-Oakland Newspaper Guild v. Kennedy,* 412 F.2d 541, 544–545 (9th Cir.1969) (footnote omitted).[46]

■ In determining whether an injunction should issue, this Court must focus on whether there is reasonable cause to believe that the union's *objective,* by picketing at the locations described above, was to indirectly pressure Scoma's by enmeshing neutral employers in its labor dispute. *See Constar, Inc. v. Plumbers Local 447,* 568 F.Supp. 1440, 1442 (E.D.Cal.1983) ("[S]ince picketing ... is not unlawful in itself, '[t]he key to determining whether Section 158(b)(4)(i) and (ii)(B) was violated here is to identify the *object* of the union's picketing ...' ") (emph. in original).

Petitioner contends that because Respondent could have limited its picketing to the area directly north of Scoma's, and still confronted persons seeking access to the restaurant, that there is reasonable cause to believe that one of the Union's objectives, in picketing along and at the head of Jones Alley was to bring pressure on the neutral parties using the Alley. Petitioner further contends that such a belief is buttressed by the Aark Seafood "incident", the possible reluctance of certain companies to make deliveries to the door of United Shell

---

**46.** This Court recognizes that it is bound by the standard set forth in *Kennedy, supra,* and has made its ruling in light of its teachings. However, this Court does not infer from *Kennedy* that our Circuit desires district courts to merely rubber-stamp every Board petition for an injunction pursuant to § 10(*l*) of the Act. Rather, the language of *Kennedy* must be read in the context of the statutory framework requiring the Board to make a showing of "reasonable cause" to believe violation has occurred.

This Court also recognizes that strikes may settle by the time the Board holds its formal hearing on the complaint, rendering such a hearing or further action by the Board moot. Thus, the resolution of a § 10(*l*) petition may, practically speaking, dispose of the issues raised by the complaint. Given the above, and the thoughtful analysis in *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers Union,* 494 F.2d 1230, 1239–45 (2nd Cir.1974), this Court respectfully submits that the reasonable cause standard provided for in the Act does not warrant dilution.

Fish, and the alleged 15% loss of business by United Shell Fish.

■ However, upon reviewing the circumstances and facts as a whole, as this Court is required to do, *Retail Fruit & Vegetable Clerks v. NLRB (Crystal Palace)*, 249 F.2d 591, 599 (9th Cir.1957), we conclude that Board's evidence supporting its petition is insubstantial and that no reasonable basis exists for believing that Respondent intends to enmesh neutral employers in its dispute with Scoma's.

■ First, primary, lawful, objectives are readily apparent from the particular physical layout in this case. As described above, the physical entrance to Scoma's is approximately 400 feet from the Jones Alley and Jefferson Street intersection, and is not visible from that point. Respondent convincingly argues that to effectively picket the primary employer, potential patrons must be appraised of the strike before they walk or drive the length of the Alley. Moreover, Scoma's maintains a large sign at the intersection and uses the Alley intermittently to shuttle patrons/employees and thus to some extent maintains a presence at the head of and along the Alley. These two factors further indicate that picketing at the locations described above is important to Respondent's ability to effectively picket the primary employer. In addition, the Union has a legitimate and primary objective in picketing in areas that are generally visible in order to fully appraise the public of its grievance with the primary employer.[47]

Not only does the peculiar physical setting, the sign, and the shuttle, provide clearly lawful and primary objectives, but given the affidavits submitted to the Court, there is no reasonable basis for believing that the Union had any *other* secondary or unlawful objectives. As discussed in the findings of fact, the Union has taken numerous affirmative steps to avert any negative impact that the strike might have on neutral employers, including sending telegrams and making personal visits to various neutrals, referring customers to businesses on the Alley, and posting signs indicating that the dispute is only with Scoma's. It is also undisputed that, at all times, the strikers carried picket signs clearly indicating that the dispute was with Scoma's.

In addition to the undisputed affirmative efforts by Respondent, the record also reflects a marked absence of any significant evidence indicating a secondary objective. Of all the numerous neutral businesses on the Alley, only one, United Shell Fish, maintains that it suffers any disruptions, interference, or loss of revenue due to pickets, and most of those allegations were so undermined by contrary affidavits that the Board abandoned reliance on them, except for the undocumented allegation that revenues had declined 15% and the reference to the Aark Seafood incident.

If a union's object is to enmesh neutrals, it is likely that this intent would result in some verifiable effects and/or affirmative efforts by the union, apart from the mere location of the pickets, to discourage neutral use of the Alley. However, besides the undocumented 15% revenue loss by United Shell Fish, which if true could be caused by any number of reasons, the Board can only point to one, apparently isolated, incident involving a delivery by Aark Seafood Company. Moreover, an examination of the relevant affidavits suggests that, in that incident, the strikers were concerned with ascertaining the driver's destination, not in preventing a delivery to United Shell Fish. In light of the record as a whole, the above evidence appears insubstantial.

In sum, given respondent's clear, primary lawful objectives, any inference that respondent harbored an unlawful objective by virtue of the location of the pickets, is amply rebutted by respondent's affirmative efforts to prevent interference with neutrals, and the near absence of evidence indicating an unlawful intent or negative effects on neutrals due to the picketing.

---

**47.** See Respondent's Affidavits, pp. 13–14.

The Court therefore concludes that there is no reasonable basis, on the record before us, for believing that the Union was picketing with an unlawful objective in violation of the Act. The Court further concludes that to the extent neutral businesses have been adversely affected, such effects have been minimal and incidental to the Union's primary lawful objectives.

■■■■ This Court is not unmindful of the fact that where primary and neutral employers do business in the same or closely related area, that special care must be taken to protect the neutral employers from involvement in unrelated labor disputes.[48] Such a situation requires a careful balancing of the Union's right to effectively communicate its grievance with the primary employer against the interests of the neutral employers to be free from controversy. *See Sailors Union of the Pacific (Moore Dry Dock)*, 92 NLRB 547, 549

(1950). The Union has an obligation to conduct its picketing so as to "minimize its impact on neutral employees [or others] insofar as this can be done without substantial impairment of the effectiveness of the picketing in reaching the primary employees [or employers]." *Retail Fruit & Vegetable Clerks' Union (Crystal Palace Market)*, 116 NLRB 856 (1956), enf'd, 249 F.2d 591 (9th Cir.1957). Here, where the record shows that respondent has tried to minimize its impact on neutrals to the extent possible without substantially impairing effectiveness, and where, in light of the record as a whole, there is insubstantial evidence of an unlawful objective, Petitioner has failed to establish the reasonable cause necessary to support the issuance of an injunction under § 10(*l*) of the Act. Accordingly, the Petition for Injunction is HEREBY DENIED.

IT IS SO ORDERED.

**48.** The Court notes that this is not the usual "common situs" case in which the primary and neutral employers operate out of a single site. *See Moore Dry Dock, supra.* Counsel have not pointed to, and this Court is not aware of, any cases involving the unusual situs situation presented by this case.